**SHORE BUILDERS, INC., Old Court Joint Ventures, Inc., and Crab Cove Limited Partnership, Plaintiffs,**

v.

**DOGWOOD, INC., M.K.T. Enterprises, Inc., and Ocean View Enterprises, Inc., Defendants.**

**Civ. A. No. 84–508 CMW.**

United States District Court,
D. Delaware.

June 21, 1985.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, Del., for plaintiffs.

George B. Smith, and James L. Patton, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This action for rescission of a contract, or in the alternative, for an abatement of

the contract price and reformation of purchase-money mortgages, arises out of the purchase and sale of a partnership whose sole asset is an undeveloped tract of land. Although formally characterized as the sale of a partnership, the underlying purpose of the transaction was to convey ownership in the real estate from one group of corporate entities to another. The purchasers, two Maryland corporations, and their associated limited partnership, initiated suit against the sellers, three closely-held Delaware corporations, within a year after the conveyance, seeking rescission of the contract on grounds of misrepresentation, mutual mistake, and breach of an express warranty. Both the purchasers and sellers have moved for summary judgment.

BACKGROUND FACTS [1]

Ocean River Acres, the real estate that is the subject of this controversy, is a 116 acre undeveloped tract of land that fronts on Indian River Bay in Sussex County, Delaware. The property's location on Indian River Bay is a crucial factor in this dispute because real estate development adjacent to waterways is subject to the wetlands regulatory jurisdiction of the federal government and the State of Delaware.

Federal jurisdiction over wetlands [2] arises under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The Army Corps of Engineers ("Corps") administers the federal government's jurisdiction under both statutes through its authority to grant permits for activities which are otherwise prohibited.

The Corps must approve the construction of any structures in navigable waters pursuant to Section 10 of the Rivers and Harbors Act. Since navigable waters is defined in terms of the "mean high water mark," 33 C.F.R. § 332.2(a) (1984), some areas within the waters of the United States may have only a slight amount of water at certain times of the year. Nevertheless, the placement of structures on these "tidal" wetlands is within the Corps' jurisdiction.

Under Section 404 of the Clean Water Act, the Corps, by delegation, also exercises authority over the discharge of dredged or fill material in navigable waters and wetlands. Section 404, however, defines wetlands as including not only tidal wetlands but "non-tidal" wetlands as well; that is, lands adjacent to navigable water exhibiting the characteristics of wetlands as defined above. See 33 C.F.R. §§ 323.-3(a)(7), 323.2(d) (1984). Significantly, non-tidal wetlands subject to Corps regulation can exist on the landward side of the high tide line.[3]

The Corps issues general and individual permits in connection with dredging and filling on wetlands. General permits are in the form of an exemption for certain categories of activity which the Corps has predetermined will have only minimal effects on regulated areas. See 33 C.F.R. § 323.-2(n) (1984). Individual permits must be obtained in all other cases and are issued only on a case by case evaluation. See 33 C.F.R. § 323.2(m) (1984). The extent of Corps-regulated wetlands in an area, especially non-tidal wetlands, is not readily discernible except by environmental special-

---

**1.** Documents other than pleadings contained in the Court's record are referred to by their docket item ("D.I.") number, followed by a colon and the relevant page number. Parentheticals will be used to identify the nature of the document.

**2.** "Wetlands", for purposes of federal law, is defined as:

    ... those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands

generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.3(c) (1984).

**3.** The "mean high water mark" and "high tide line" are distinct concepts, although in practice they may turn out to be the same. D.I. 165–67 (Winkler Dep.). The mean high water mark is easily determined by an engineer using tidal data over a series of years. *Id.* The high tide line is determined by the presence of physical characteristics on the shore caused by tidal action. *See* 33 C.F.R. § 323.3(g) (1984).

ists skilled in identifying the types of vegetation peculiar to wetlands. *Cf.* 40 C.F.R. § 340.41(a)(2) (1984). Accordingly, the Corps delineates regulated wetlands on an individual site inspection basis in response to the applications it receives or on its own initiative in connection with enforcement activities. The ultimate delineation of wetlands will vary somewhat depending on the field representative making the evaluation, but each Corps representative tries to adhere to consistent guidelines. As a matter of practice, the Corps adheres to the delineation of jurisdiction made by its field representative.

The Department of Natural Resources and Environmental Control of the State of Delaware ("DNREC") exercises jurisdiction over State defined wetlands pursuant to the State Wetlands Act. 7 *Del.C.* §§ 6601–6620. State designated wetlands [4] are presumptively determined, subject to appeal, by official State Wetlands Maps prepared by use of aerial infrared photography. These maps, although providing a quick method of determining the extent of wetlands in a specific area, are not an adequate source for delineating the precise boundaries of wetlands on a specific piece of property. A determination of the extent of State regulated wetlands ultimately requires the same sort of on-site inspection used by the Corps to delimit its own wetland jurisdiction.

The Ocean River Acres subdivision was owned throughout the relevant portion of the events leading up to this case by Ocean River Joint Ventures, a partnership organized for the purpose of acquiring, developing, and selling the subdivision. At all times up until sale, Bonard Timmons, an officer and major shareholder in each of the three corporate defendants, acted as an agent for the partnership in promoting and managing the property. Timmons commissioned Peter Lowenstein, a professional land surveyor, to prepare a subdivision in

1975. The result was the Lowenstein Subdivision Plan consisting of 206 lots. D.I. 59A:4 (Appendix to Plaintiffs' Opening Brief). The lots were laid out so as to comply with local zoning regulations.

During the Lowenstein Plan's inception or shortly thereafter, Timmons decided to include an inland marina in the subdivision. At Timmons' direction, Lowenstein submitted, in early 1976, an application for a permit to construct a private inland marina both to the Corps and DNREC. In connection with this application, the Corps' Environmental Resources Branch prepared an assessment that clearly identified the presence of wetlands. D.I. 59A:20. The report was placed in the Corps' regional branch office file and was accessible to the public upon written application. There is no evidence, however, that Timmons actually ever saw this report.

The Corps, however, expressed its position in a letter to Mr. Lowenstein in June of 1976. The letter requested additional information and stated that any inland marina would be strongly opposed by the Corps because of the damage such a project would cause to existing wetlands. D.I. 59A:24. Timmons' proposal received a less specific but equally unfavorable response from a division with DNREC that also sought additional information. D.I. 59A:26. Shortly thereafter, Timmons abandoned the inland marina concept.

In 1977, the Joint Venture had Ira A. Garbutt, a surveyor and planning consultant, prepare a revised subdivision plan for Ocean River Acres. The Garbutt plan provided for 238 single family residential lots, a slight increase over the Lowenstein Plan, with the lots laid out in four sections A through D. It is generally conceded that the fifty-one lots in Section A were more valuable than lots in other sections because of the unobstructed view of the bay possessed by some of the lots and the proximi-

---

**4.** Wetlands is defined, under state law, in pertinent part as:

   ... those lands above the mean low water elevation including any bank, marsh, swamp, meadow, flat or other low land subject to tidal action in the State along ... Indian River Bay

   ... whose surface is at or below an elevation of 2 feet above local mean high water, and upon which may grow or is capable of growing specific varieties of wetland vegetation. 7 *Del.C.* § 6603(h).

ty of the lots to the bay. The subdivision was approved by the Sussex County Planning and Zoning Commission that same year. The Planning and Zoning Commission's approval, of course, does not waive any requirements for permits from other governmental agencies. The inherent limitations of the Commission's approval is explicitly noted in a disclaimer that appears on the Commission's official stamp affixed to the first page of approved subdivisions.

Sometime after 1980, the Joint Venture partners, lacking the capital to develop the Ocean River Acres subdivision themselves, began to entertain the possibility of selling the property to another party. The sale that led ultimately to this lawsuit did not actually begin to take shape until the summer of 1983. In August of that year, Joyce Widmayer, a real estate agent working for Holiday Real Estate in Ocean City, Maryland, contacted Ocean View Real Estate Co., a related entity to the three corporate defendants, regarding the availability of waterfront properties. Widmayer was given a Listing Sheet for Ocean River Acres and discussed the location and features of the subdivision with one of Timmons' associates.

Widmayer passed her information on to Mr. W. Philip Cadogan, President of one of the plaintiff Maryland corporations, Shore Builders, Inc., on whose behalf she had been making inquiries. Mr. Cadogan was interested in the property and, in early November, 1983, he, along with Widmayer, met Timmons at his office. Timmons provided Cadogan with a complete copy of the Garbutt Subdivision Plan which bore the Sussex County Planning and Zoning Commission's stamp of approval.

Timmons also gave a tour of the property to Cadogan and Widmayer. The substance of the conversation among the purchasers' and sellers' agents during the tour is a matter of some dispute. Everyone agrees that Timmons explained his idea of an in-bay marina for which he claimed he had received assurances of approval by the Corps. Questions arise regarding the adequacy with which he disclosed the aborted efforts to gain Corps approval for an inland marina. *Compare* D.I. 56:41 (Timmons'

Dep.), *and* D.I. 60:32 (Widmayer Dep.), *with* D.I. 65:10 (Cadogan Dep. II). The individuals do agree, however, that Timmons described the areas along the bayfront and the near side of an adjoining property, designated as "Recreation Area" and "Open Area" in the Garbutt Plan, were described as wetlands on which building was prohibited. D.I. 54:112 (Cadogan Dep. I); D.I. 60:103 (Widmayer Dep.); D.I. 73:8 (Defendants' Answering Brief).

There is also substantial agreement among the parties what was *not* said, namely, that the lots so laid out in the Garbutt Subdivision Plan encroached on wetlands. This follows from Cadogan and Widmayer's averments to that effect, D.I. 54:110–11 (Cadogan Dep. I); D.I. 60:53 (Widmayer Dep.), and Timmons' own testimony that he was not aware of any encroachment. D.I. 56:42, 60–61, 188 (Timmons Dep.). Obviously, Timmons could not warn the purchasers' agents of something of which he was unaware. In view of Timmons' careful delineation of areas on which building was not permitted, Cadogan could understandably have inferred that building was permitted in the areas not set off as "open" or "recreation" in the Garbutt Subdivision Plan.

Timmons offered to sell the property for three million dollars, insisting that the price was not negotiable. After making numerous calculations based on assumptions regarding the average price per lot and the expected price he could obtain for each lot, D.I. 54:58–59 (Cadogan Dep. I); D.I. 60:22, 34–35 (Widmayer Dep.), Cadogan instructed Widmayer to prepare and present a property purchase contract to Timmons. Timmons was aware of Cadogan's calculations based on a 238 lot subdivision and Cadogan's intent to use all of the projected lots in his development. D.I. 56:32, 126, 207 (Timmons Dep.). Within a matter of days, a Contract of Sale (dated November 15, 1983), had been signed.

The contract described the property to be sold as "Ocean River Acres, known as Parcel A, Section A, Section B, Section C, and Section D, a subdivision containing 238 re-

corded lots, a total of 116 acres and duly recorded as P.B. 13, pg. 128." D.I. 59A:A–61–62 ("Contract of Sale"). It provided that the purchaser would have a thirty-day option to cancel, with the closing to occur within ninety days of the expiration of the option. The contract was set forth in a standard preprinted form used by Holiday Real Estate in transactions involving the sale of single family residential dwellings. The contract also contained an Addendum enumerating six additional provisions, each made at the request of one of the parties and agreed to by the other.[5] D.I. 59A:A–63 ("Addendum").

In the intervening period between the date on which the Contract of Sale was signed and the closing, Cadogan conducted a preliminary evaluation of the project. At Cadogan's request, Timmons obtained a letter from the Sussex County Planning and Zoning Commission that building permits would issue subject to state road approval. Cadogan also retained the services of several real estate and engineering consultants. Lowrie Sergeant, a real estate consultant, inspected the project and reported that, in his opinion, the project was economically feasible. In addition, Steven Soule, an engineer associated with Peter Lowenstein, was briefly retained during which time he prepared a preliminary cost estimate on installation of certain property improvements. William Mann, another engineer, was engaged in November, 1983, to perform the site engineering which included an evaluation of the necessary permits to begin construction. Mann's list of necessary permits was completed by the end of January, but did not include any references to obtaining State or Corps approval permits except for purposes of construcing a marina. D.I. 59A:A–65.

Mann alleges that he raised with Cadogan in November the possibility that some of the lots might be lost to wetlands and that Cadogan brushed such concerns aside. D.I. 78:104–107 (Mann Dep.). *But see* D.I. 65:71–72 (Cadogan Dep. II). Mann's testimony on this issue, however, is confusing. Mann was never sure that wetlands actually encroached on the subdivided lots and, although he expressed concerns regarding wetlands, he never undertook a survey to determine the extent of any encroachment. D.I. 78:104–107. Despite his concerns, Mann conceded his surprise when the Corps finally delineated the extent of the wetlands on the Ocean River Acres property. *Id.* at 126.

In early 1984, Timmons suggested, and Cadogan agreed, that the form of the transaction be changed from a purchase of real property to a purchase of the corporate defendants' partnership interests in the Ocean River Joint Venture. The purpose behind restructuring the transaction was to save taxes. Settlement was set for March 30, 1984 and in connection with the closing, a new agreement, an Agreement and Bill of Sale, was drafted. This document significantly differed in several respects from the original Contract of Sale. Besides the obvious restructuring of the transaction as a sale of personal property instead of real property, the Agreement deleted the earlier Contract's boilerplate provisions and some of the provisions specified in the Addendum, and inserted a clause expressly providing for indemnification by the sellers with respect to the representations made by them regarding the property. D.I. 59A:A–66–69 ("Agreement and Bill of Sale"). The Agreement was signed only by the sellers. Apparently, this was not an oversight on the part of the buyers, but rather the omission reflecting the intention of the parties that the Agreement not be fully executed. D.I. 79:52 (Griffin Dep.). Instead, the purchasers and

---

**5.** The Addendum provided as follows:

TERMS: Land must pass a perk test in all sections. Electric Power must be available to be hooked up to property. Marina must be approved by the Corps of Engineers.

....

(1) Time is of essence in the 30 day option and in the 90 day settlement period.

(2) Purchaser must notify seller in writing immediately upon the obtaining financing, permits, and all other contingencies.

(3) If purchaser fails to complete settlement, the purchaser will turn over to seller all paperwork, permits, etc. to seller.

sellers executed an Amendment to Agreement of Ocean River Joint Venture. D.I. 59A:A–70. In connection with the settlement, a new financing arrangement was adopted whereby the sellers took back three mortgages for a portion of the purchase price. Each of the defendants received a mortgage signed by both of the corporate plaintiffs. D.I. 73A:A–71–88 (Appendix to Defendants' Answering Brief). Timmons also prepared a mortgage release schedule, entitled "Ocean River Acres Lot Release and Mortgage Breakdown of 238 Lots" with cost release prices which varied by section for those lots which were to secure each of the sellers' respective purchase-money mortgages. D.I. 59A:A–73, 74.

Cadogan's difficulties did not begin until shortly after the closing. During a presentation to the Joint Permit Processing Panel on April 12, 1984, the Corps' representative to the Panel informed Cadogan that any further review of his request for a marina permit would have to be deferred until the Corps conducted an on-site inspection. The purpose of the JPPP is to afford developers an opportunity to present their plans to an intragovernmental panel consisting of state and federal officials regarding the developer's entire permit needs. Although Cadogan had sought to make a presentation to the JPPP sooner, the JPPP was unable to accommodate his scheduling request.

Even after the meeting, Cadogan was not aware of the magnitude of the problem he potentially faced. He thought that the Corps was exclusively concerned with the marina's effect on the bayfront. On June 13, 1984, Jacqueline Winkler, a Corps' representative, accompanied by a DRNEC representative, made an initial visit and a preliminary determination of the extent of the wetlands on the property. Much to the surprise of Cadogan, Timmons and Mann, who were all present, her delineation of restricted wetlands included extensive areas that existed as subdivided building lots in the Garbutt Subdivision Plan. The preliminary wetlands delineation was confirmed and a final delineation was completed in the course of three additional on-site

inspections in 1984 on June 25, July 2, and July 25.

While the final delineation was in the process of being completed, Cadogan attended another JPPP meeting on June 19 at which he was allegedly told that further consideration of his development plan by the Corps depended on his obtaining a new subdivision plan that reflected the Corps' delineation of wetlands. D.I. 65:117–18 (Cadogan Dep. II). A final Survey Plan confirming the Corps delineated wetlands area and modifying the property's subdivision was subsequently prepared and was tentatively approved by the JPPP including the Corps at a meeting on September 27, 1984. After further minor revisions, it received final approval in early 1985. As a result of the Corps' delineation of wetlands, plaintiffs allegedly lost 38 lots from the project after resubdividing the property in accordance with the delineated wetlands boundaries. D.I. 1:¶ 18 (Complaint). Throughout this dispute, Cadogan has continued to work on development of the property. D.I. 54:147–48 (Cadogan. Dep. I).

DISCUSSION

Plaintiffs have moved for summary judgment on the merits of two of their claims for relief: mutual mistake and innocent misrepresentation. The defendants contend that plaintiffs have failed to establish an uncontroverted factual basis from which the requisite elements for relief can be inferred and therefore, the Court should deny the plaintiffs' motion. Moreover, defendants claim that the evidentiary record demonstrates that the deficiencies in plaintiffs' motion are irremediable and accordingly, that they are entitled to summary judgment.

To be entitled to summary judgment, the moving party must show that there are no genuine issues of material fact. Fed.R.Civ. 56(c). No genuine issue of material fact exists, if the Court, after resolving all factual disputes having a colorable foundation in the evidentiary record, in favor of the non-moving party, finds the moving party is still entitled to judgment as a matter of law. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976), *cert. de-*

*nied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Although the purpose of summary judgment is to eliminate the expense and delay of unnecessary trials, that salutary purpose cannot lead courts to dispense with trial, no matter how exhaustive the record or overwhelming the evidence on a particular issue, when the Court, in order to enter judgment, is required to resolve issues of facts that are actually disputed in the record.

The parties, in their respective motions for summary judgment, present an exhaustive discussion of the facts in this case. Plaintiffs' Opening Brief and Defendants' Answering Brief consist of nearly eighty pages of factual recital, and two hundred pages of appendices. In addition, the briefs freely refer to at least eight depositions, some of which are in excess of two hundred pages. This forest of factual detail poses a fundamental obstacle to the Court's ability to address the issues raised in the parties' motions on summary judgment. Obviously the Court's ability to canvas the record and make independent determinations with respect to existence and truth or falsity of the numerous alleged mistakes and misrepresentations would involve nothing less than a trial on the merits by deposition.

In order to cut through this thicket, the Court will focus on what it believes to be the two most important of the alleged misrepresentations or mistakes.[6] The "encroachment" problem of which the contracting parties became aware after the sale, reflects a misunderstanding regarding the fact that the subdivided lots as provided in the Garbutt Subdivision Plan substantially encroached on federal wetlands. The assumption that the 238 lots provided in the Garbutt Subdivision Plan were all buildable marks a second crucial misunderstanding. The Court will analyze whether these two misunderstandings, on the present evidentiary record, establish a basis for rescission as plaintiffs contend, or whether, as defendants argue, the record is incapable of supporting claims for mutual mistake and innocent misrepresentation.

1. *Mutual Mistake and Innocent Misrepresentation.*

■ This case involves questions of state law on which this Court's application of Delaware law must be guided by its predictions of how Delaware's highest court, if presented with the same issues of law, would resolve them.[7] *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Real estate transactions represent a frequent context in which Delaware courts have entertained actions seeking equitable relief on ground of mutual mistake, *see Collins v. Burke,* 418 A.2d 999 (Del.1980); *Dugan v. Bosco,* 34 Del.Ch. 599, 108 A.2d 586 (1954), and innocent misrepresentation. *See Norton v. Poplos,* 443 A.2d 1 (Del.1982). Both *Collins* and *Dugan* are consistent with the view expressed in the *Restatement (Second) of Contracts* § 152 (1981) that a mutual mistake as to a basic assumption underlying a contract between the parties at the time of the contract's making, renders a contract voidable

---

6. Plaintiffs' briefs identify several misrepresentations that will be discussed only in the footnotes of the opinion because the alleged misrepresentations involve either disputed issues of fact arising from conflicting evidence, or merely a variation of misrepresentations discussed in the main body of the opinion. The most important of plaintiffs' alleged misrepresentations that will be given cursory treatment are: (1) defendants, acting through their agent Timmons, failed to disclose the Corps' 1976 rejection of an earlier request for an inland marina; (2) Timmons represented that the building lots had suitable soil to pass a percolation test; and (3) Timmons represented that the Corps had indicated to him that a permit of an in-bay marina would be approved.

7. Frequently, a definitive statement of state law is unavailable because a state's highest court has not recently addressed a particular question of law. *See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 284 (3d Cir. 1980). Under such circumstances, a federal court must turn to other evidence of state law such as: lower state court precedents, related decisions and considered dicta of a state's highest court, the policies that inform that court's application of certain legal doctrines, the decision of courts in other jurisdictions and even legal treatises and articles. *See McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662–63 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *Brown v. Caterpillar Tractor Co.,* 696 F.2d 246, 250 (3d Cir.1982).

if the mistake has a material effect on the agreed-upon allocation of benefits and burdens under the contract, unless the contract, expressly or impliedly, allocates the risk of a particular mistake to one of the parties. With respect to innocent misrepresentation, the rule applied by Delaware courts is more than merely consistent with the *Restatement (Second)*; the *Norton* decision explicitly relied on the analysis of misrepresentation contained in §§ 159–64. In *Norton*, the Delaware Supreme Court held that a material representation, innocently made, but nevertheless false, renders a contract voidable when one of the parties justifiably relies on the misstatement in making the contract. *Norton v. Poplos, supra,* 443 A.2d at 5–6.

These general principles which provide a basis for rescission of a contract entail proof of a number of discrete elements. And although the two causes of action involve slightly different elements, they frequently may apply to the same situation. Both causes of action share a common assumption about the contracting party with disappointed expectations, in this case the purchaser: both theories of relief assume that the purchaser was mistaken about a significant fact at the time a contract was made. This assumption reflects two factual requirements: (1) that there existed assumptions or representations that ultimately proved incorrect, and (2) that the buyer actually believed the representations or entertained the mistaken assumption.

Mutual mistake and innocent misrepresentation are different in what they assume about the other party, in this case the seller. Mutual mistake assumes that the seller is subject to the same mistake as the purchaser. The justification for rescission in this situation is that there has been some defect in the bargaining process that produces inequitable results and accordingly, the contract should be set aside.

In the case of material or innocent misrepresentation, it is the significance of the facts misrepresented, rather than the extent of the seller's knowledge that creates a basis for rescission. Rescission is justified on the theory that a party responsible for misstatements upon which others innocently rely would be unjustly enriched if he were not held accountable for his misrepresentation. The rule works to deny a seller the benefits of his bargain when the benefits are derived at the expense of a buyer misinformed by the seller.

### A. *Purchasers' Mistake As To The Facts Or Their Belief In Facts Allegedly Misrepresented.*

Both the existence of an encroachment problem and the assumption that the Garbutt Subdivision Plan was buildable represent facts with respect to which the purchasers claim they were misinformed. At first glance, there appears to be strong support for the purchasers' claims. Timmons, not knowing himself of the existence of an encroachment problem, never hinted to Cadogan of its existence. Cadogan proclaims his own ignorance of the facts. Similarly, the buildability of the subdivision according to the Garbutt Subdivision Plan which Timmons had supplied to Cadogan, was an operative assumption in Cadogan's purchase.

Defendants set out a two-pronged factual defense to plaintiffs' claims that they were either mistaken or misinformed. The first prong of the defense is partial in that it goes only to the misunderstanding with respect to the "buildability" of the subdivision. Defendants contend that since the subdivision is, in fact, buildable in accordance with the Garbutt Subdivision Plan, any claim of misrepresentation or mistake with respect to the buildability assumption is factually flawed. Defendants rely on the deposition of Jacqueline Winkler, a Corps' representative, in which she describes circumstances under which it is possible to locate structures on regulated wetlands without a permit.[8] D.I. 70:167–76.

8. Plaintiffs have objected to this part of Winkler's deposition on grounds that she is not competent to render an interpretation of Corps' policy. This objection is overruled. Although Winkler's testimony may not be a definitive statement of Corps' policy, it is nevertheless probative of the Corps' position with respect to certain issues. Plaintiffs are, of course, free to rebut such an interpretation with Corps' doc-

The difficulty with defendants' argument is that it assumes that the sole concern of the Court is with the literal meaning of "buildability" and thus, so long as something is "buildable" on the wetlands, then the underlying assumption must have been true.

This is simply not the case. Often times a statement of fact, unaccompanied by any qualification, is misleading, although the statement of fact may be technically true. As § 159 of the *Restatement (Second) of Contracts* notes, "A statement may be true with respect to the facts, but may fail to include qualifying matter necessary to prevent the implication of an assertion that is false with respect to other facts." In referring to this section, the court in *Norton v. Poplos,* 443 A.2d 1, 5 (Del.1983) found that a seller's representation that the property was commercially zoned, could have led the purchaser to assume that the premises were suitable for his commercial purposes. Thus, in that context, the purchaser may well have been misinformed. Similarly, the purchasers in this case may have inferred that buildability meant that the subdivision was not subject to significant undisclosed building restrictions. The presence of the wetlands represents such a restriction. Although the overwhelming weight appears to support plaintiffs' contention that they were misinformed regarding buildability,[9] the Court cannot say that defendants' defense is completely devoid of merit as a matter of law.

Defendants contend in the second prong of their defense that plaintiffs had either actual or constructive knowledge of the existence of an encroachment problem or the difficulties they would encounter in trying to build in accordance with the Garbutt Subdivision Plan.[10] Defendants rest their contention on Mann's statement that he informed Cadogan as early as November of 1983 that he could potentially lose a few lots to wetlands. Mann's recollection is disputed by Cadogan and so, at the very least, there appears to be a triable issue of fact.

Even assuming the truth of Mann's testimony, however, it is difficult to say that Mann's testimony is sufficient to demonstrate that Cadogan had actual knowledge regarding the existence of an encroachment problem. Mann's warning to Cadogan did not provide notice of the extent of the problem that the purchasers faced. Thus, an additional issue of fact in connection with any actual knowledge Cadogan may have had, concerns the adequacy of his knowledge.

■ Alternatively, the defendants argue that Cadogan should be charged with constructive knowledge of the presence of wetlands on the subdivided lots. Defendants' assertion is premised on two propositions, one legal and the other factual. The legal proposition is that the independent contractors retained by Cadogan were his agents, and therefore, their knowledge should be imputed to him. The factual proposition is that the independent contractors had specific knowledge of the presence and extent of the wetlands in subdivided areas. The legal proposition is simply wrong as a matter of law, while the factual proposition is merely questionable based upon the existing evidentiary record. While it is true that an agent's knowledge of facts can be imputed to his principal to defeat a claim of mistake or misrepresentation, *see Nolan v. The Eastern Co.,* 241 A.2d 885 (Del.Ch. 1968), *aff'd. sub. nom Nolan v. Hershey,* 249 A.2d 45 (Del.1969), Soule and Mann, independent contractors retained by Cadogan to conduct preliminary engineering evaluations on behalf of the purchasers, were never Cadogan's agents. Admittedly, the mere fact that an individual is an independent contractor does not preclude his being an agent. *See Restatement (Sec-*

---

uments or the testimony of other Corps' personnel.

**9.** If plaintiffs are successful on this issue, that does not mean that Winkler's testimony is irrelevant, since her statements go to the materiality of any mistake or misrepresentation.

**10.** This same issue arises in determining whether the purchasers' reliance on the sellers' representations were justified.

*ond) of Agency* § 2(3) (1957). An independent contractor, however, who does not exhibit any of the essential characteristics of agency is not an agent. In this particular case, Soule and Mann lacked the power to alter the legal relations of the principal and third-parties. *See id.* at § 12. Certainly Soule and Mann could not enter contracts on Cadogan's behalf. Nor would Cadogan have been responsible for torts committed by either Soule or Mann on their way to or from Ocean River Acres. Moreover, Soule's and Mann's employment relationship did not include acting in a fiduciary capacity with respect to the duties they were retained to perform. *See id.* at § 13; *see also id.* at § 14N.

Because of this Court's holding, as a matter of law, that neither Soule nor Mann was an agent of Cadogan, it is perhaps unnecessary to address the factual component of defendants' argument. Nevertheless, it should be noted that many of the factual questions are identical to issues raised in the Court's earlier discussion of issues regarding Cadogan's actual knowledge. In short, unlike the *Nolan* case in which an agent was given unambiguous notice of a fact to which his principal was mistaken, the record here does not offer strong support for concluding that Mann or Soule actually understood the extent of the wetlands' problem. Thus, even if attribution were appropriate, it is far from clear that defendants would be entitled to summary judgment.

### B. *Sellers' Mistake Of Facts Or Innocent Misrepresentations.*

An action for rescission based on mutual mistake assumes that the seller is equally mistaken as the purchaser regarding a basic assumption underlying the contract. The record indicates without dispute that the sellers were mistaken regarding two facts: the subdivided lots substantially encroached on federal wetlands and the encroachment created significant restrictions on the subdivision's buildability.

These mistakes of fact can also be the source of innocent misrepresentation if the sellers made representations to the purchasers inconsistent with these facts. Tim-

mons admits to representing to the purchasers that the Garbutt Subdivision Plan, providing for 238 lots, was buildable. Because the Court has already found that this was only a halftruth in that Timmons failed to disclose the existence of significant additional restrictions on building as a result of his ignorance, there can be no question that Timmons' conduct constituted innocent misrepresentation. *See, e.g., Restatement (Second) of Contract* § 162 comment c, illustration 3 (example in which A, while negotiating with B for the sale of his horse, mistakenly informs B that the horse has been timed at a time slower than the horse has actually run, is equated with misrepresentation).

Whether Timmons actually ever made a representation that wetlands did not encroach on the subdivided lots is a matter of dispute among the parties that will be resolved at trial. An alternative theory of misrepresentation involves consideration of whether failure to disclose the encroachment problem constitutes a misrepresentation in itself. Nondisclosure can be a form of assertion, but only when the non-disclosure is with respect to "a fact known" to the person accused of making the non-disclosure. *Id.* at § 161. Clearly, seeking rescission based on misrepresentation through non-disclosure is inconsistent with seeking rescission on the basis of mutual mistake. Accordingly, if plaintiffs wish to proceed on their theory of mutual mistake, then Timmons can be held accountable for the same mistake of fact on a theory of innocent misrepresentation only if the sellers actually represented the mistake of fact to purchasers.

### 2. *Absence of Culpable Conduct as Defense to Misrepresentation.*

■ The defendants argue that once a contract has been executed, a purchaser cannot set aside a contract for misrepresentation without a showing of fraud on the part of the seller. Plaintiffs, relying on the *Restatement (Second) of Contracts* §§ 162, 164 (1981), contend that fraud is not a requisite element for rescission of an

executed contract when the misrepresentation in question is material. The issue boils down to whether Delaware law is consistent with the *Restatement (Second)* in this regard.

The Delaware Supreme Court's decision, in *Norton v. Poplos,* 443 A.2d 1 (Del.1982), eliminated any doubt about the existence of a cause of action based on innocent misrepresentation for executory contracts. Indeed, the Court's opinion repeatedly cites the position of the *Restatement (Second)* favorable. *Id.* at 4. Defendants rest their argument on the fact that the Court noted without disapproval that lower Delaware courts had reached a contract result with respect to executed contracts. *Id.* at 4, n. 7. According to defendants, the Supreme Court's notation without comment was meant to leave the former rule with respect to executed contracts intact. While it is true the Court refrained from overruling any prior cases, neither the Court's language nor its *ratio decidendi* actually endorse the proposition urged by the defendants. Accordingly, this Court must predict how Delaware's highest court would decide the issue. This Court regards four factors as decisive.

First, as noted before, the *ratio decidendi* of *Norton* is inhospitable to distinguishing the contractual rights of victims of misrepresentation based on the presence or absence of fraud. The *Norton* Court not only recognized an action for innocent misrepresentation, but it expressly rejected contractual defenses grounded in boilerplate "merger" or "subject to" clauses. Prior to *Norton,* such clauses had been rejected only in cases of fraudulent misrepresentation. In extending that principle to cases of innocent misrepresentation, Delaware's highest court chose to regard the seller's unjust enrichment as the decisive factor in resolving the parties respective contract obligations rather than the culpability of seller's conduct. This same princi-

ple suggests that Delaware's highest court would not continue to distinguish between the rights of victims of innocent misrepresentation and victims of fraudulent misrepresentation solely because the contract made in connection with the misrepresentation has been partially performed.

Second, *Holley v. Jackson,* 39 Del.Ch. 32, 158 A.2d 803 (1958), which is frequently cited as the modern case offering definitive support for the established rule, actually suggests, at best, qualified support.[11] The cause of action in *Holley* was one for fraudulent misrepresentation so that the court did not even have the issue of innocent misrepresentation before it. Moreover, Chancellor Seitz (now Judge Seitz of the Third Circuit Court of Appeals) specifically questioned whether the fraud requirement as found in a case dating back nearly a hundred years was unnecessarily restrictive. *Id.* at 806. His remarks imply a willingness on the part of Delaware courts to reconsider the issue in light of recent developments in contract law.

Third, although defendants have urged different rules based on the distinction between an executory and executed contract, they have failed to urge any policy reasons why different legal consequences should attach to this distinction. Perhaps, the defendants' rule stems from an awareness of the difficulties in equity of restoring the status quo once parties undertake to perform a contract. These difficulties severe though they may be, are no less tractable because a misrepresentation is fraudulent instead of innocent. Ultimately, rescission of an executed contract should be regarded as equitable in nature rather than punitive. Thus, a seller's lack of culpability in making an innocent misrepresentation may be a factor for courts to consider in weighing the equities in a particular case, but that factor, alone, should not compel an automatic bar to rescission.

**11.** *Burris v. Wilmington Trust Co.,* 301 A.2d 277, 279 (Del.1972) endorses a similar proposition, namely, that an action for mistake, mutual or unilateral, must be accompanied by fraud to support a bill for reformation. *Burris,* however, involved an executory contract. Thus, its dis-

cussion of equity principles has been severely undermined by later cases. *See, e.g., Collins v. Burke,* 418 A.2d 999 (Del.1980) (mutual mistake); *Norton v. Poplos,* 443 A.2d 1 (Del.1982) (innocent misrepresentation).

Finally, Delaware courts have ordered extraordinary equitable relief in actions involving executed contracts involving mutual mistake. *See, e.g., Collins v. Burke* 418 A.2d 999 (Del.1980) (ordering reformation); *Dugan v. Bosco*, 34 Del.Ch. 599, 108 A.2d 586 (1954) (ordering rescission). The defendants have not provided, nor can the Court think of any reason for permitting rescission of executed contracts in the case of mutual mistake, while prohibiting such a remedy in the case of innocent misrepresentation. For these four reasons, this Court predicts that Delaware's highest court would permit an action for rescission of an executed contract based on innocent misrepresentation.

### 3. Materiality of Alleged Mistakes and Misrepresentations.

■ Although the standard of materiality for mutual mistake and misrepresentation are different, both causes of action require that the underlying mistake of fact be, in some sense, material. The *Restatement*'s section on mutual mistake requires materiality in two senses. The section requires that the mistake concern "a basic assumption on which the contract was made" and further, that the mistake must also have "a material effect on the agreed exchange of performances." *Restatement (Second) of Contracts* § 152 (1981). The undisputed purpose of Cadogan's purchase of the Ocean River Acres property was for development of a subdivision along the lines set forth in the Garbutt Subdivision Plan. The discovery that the subdivided lots encroached on federal wetlands went to the very purpose of the transaction. Indeed, the facts in this case resemble the kind of situations considered by the ALI in connection with this section. Section 52 comment b, illustration 1 offers the following example:

A contracts to sell and B to buy a tract of land, the value of which has depended mainly on the timber on it. Both A and B believe that the timber is still there, but in fact it has been destroyed by fire. The contract is voidable by B.

*See also Dover Pool & Racquet Club, Inc. v. Brooking*, 366 Mass. 629, 322 N.E.2d 168 (1975) (rezoning initiative two days prior to conveyance of real estate when both parties are unaware of the initiative established a factual basis for mutual mistake).

Defendants challenge the materiality of any mutual mistake on three grounds. First, they contend that any encroachment problem goes to the *quality* or *value* of the land rather than to a basic element of the contract. Defendants heavily rely on a factually similar Michigan case in urging this Court to give legal effect to this distinction. *See A & M Land Development Co. v. Miller*, 354 Mich. 681, 94 N.W.2d 197 (1959). Defendants' reliance on this case is somewhat surprising in view of their recognition that the case has been limited to its facts in a subsequent decision of the Michigan Supreme Court and thus, effectively overruled. *See Lenawee County Bd. of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982).

Admittedly, the Delaware Supreme Court is free to choose whichever rule it feels is correct. However, the more reasonable prediction is that Delaware's highest court would adopt a rule closer to *Lenawee*, which adopted the position of the *Restatement (Second)*, than to *A & M Development*. Courts applying Delaware law have frequently granted rescission when there has been a mutual mistake regarding the physical attributed of a property. *See, e.g., Dugan v. Bosco*, 34 Del.Ch. 599, 108 A.2d 586 (1954) (dwelling's septic tank actually located on adjoining property); *Palumbo v. Ewing*, 540 F.Supp. 388 (D.Del.1982) (presence of easement, sewer line and manhole on property). Although defendants assert that the physical attributes considered in the Delaware cases are different in kind from the presence of wetlands on the subject property in this case, this Court is unable to agree. Ultimately the significance of the mistake should be measured by the nature of the underlying bargain rather than scholastic legal categories removed from the transaction's realities. Here, the bargain was for land believed to be developable and without any significant undisclosed restrictions. There can be little doubt that if the parties were truly

mistaken, the legal defense urged by defendants would not bar recovery.

Defendants also contend that the presence of wetlands did not have a material effect on the contract itself. According to the defendants, the purchasers can still erect structures on the wetlands property. Plaintiffs assert that such construction is not commercially feasible. This is clearly an issue for trial. The Court, however, agrees with plaintiffs that the relevant issue bearing on materiality at trial is the commercial feasibility of building on wetlands. The cost and value of homes constructed on wetlands and the permissibility of constructing roads and driveways on wetlands are the kind of factors the Court will want to weigh in evaluating the commercial feasibility of using the land for the purpose the parties understood as the basis of the contract.

Finally, defendants suggest, at various points in their briefs, that the plaintiffs' failure to apply for permits to build on the wetlands precludes any finding at trial that there has been a "material effect" on the allocation of benefits under the contract. Only *when* and *if* a permit is actually denied, according to defendants, will the extent of any restriction on development of the subdivision be known. The Court cannot agree that the only probative evidence of the existence of a wetlands restriction on land use would be an actual denial of a permit. Other forms of relevant evidence could include testimony from Corps' officials regarding the likely outcome of any permit application or any informal representations they may have made to the purchasers at the JPPP meeting, and opinions from real estate experts regarding the effect of a property's designation as wetlands on its value.

In a similar vein, the defendants have also hinted that the Corps' field representative's delineation of wetlands on the Ocean River Acres property may not be conclusive. Although such a delineation may not be conclusive, it is highly probative. If defendants wish to pursue this issue at trial, they cannot rely on the speculative possibility that there may have been a mistake. They must come forward with specific facts that support their contention that the wetlands have been improperly delineated.

Innocent misrepresentation involves a lesser standard of materiality than mutual mistake. A misrepresentation is material if either it is "likely to induce a reasonable person to manifest his assent" or, for special reasons known to the seller, "it is likely to induce a particular" purchaser "to manifest his assent." *Id.* at § 162 comment c. Although this case provides a situation in which both standards are conceivably met, the latter standard is met without any factual dispute. Timmons knew why Cadogan was purchasing the property. Under the circumstances, Timmons' representation that the subdivision was buildable was clearly calculated to induce Cadogan to develop the subdivision.

### 4. *Justifiable Reliance and Allocation of The Risk of Mistake.*

Although the requirement of justifiable reliance in the case of innocent misrepresentation and the requirement in the case of mutual mistake that rescission is available only absent an express or implied allocation of risk, are separate and distinct inquiries, both requirements got to the extent of a purchaser's duty to discover facts with respect to which he is mistaken.

Defendants contend that the purchasers could not justifiably rely on any misrepresentation they, as sellers, may have made because the misrepresentations of which the purchasers complain were matters of opinion that could not give rise to an action for misrepresentation or matters with respect to which the purchasers had superior knowledge.

Generally, a purchaser is not justified in relying on expressions of opinion unless it is reasonable to do so because of the relative expertise of the seller when compared to that of the purchaser, and then, only if it is reasonable to infer from the seller's statement of an opinion, that the seller is not aware of any facts inconsistent with his opinion, and that the seller knows facts sufficient to justify his belief. *Id.* at

§§ 168, 169. A classic example of an opinion that should not be treated as a misrepresentation is a statement with respect to future events.[12] *See id.* at § 159 comment c; *see also Shear v. National Rifle Association of America,* 606 F.2d 1251, 1260 (D.C.Cir.1979).

Determining whether particular assertions made by the sellers were non-actionable opinions involves issues of disputed fact which depend on whether the assertion was made with certainty or stated as a belief. The evidence indicates that in representing the Garbutt Subdivision Plan as buildable, Timmons did more than state an opinion that 238 lots were available for development. At the very least, a question of fact remains, even if Timmons' assertion is regarded as an opinion, whether Cadogan was entitled to rely on it. The fact that the representation was accompanied by a comprehensive plan which already had received approval from some governmental agencies provides some indication that the particular statement had some grounding in fact.

In addition, defendants argue that even if Cadogan would otherwise have been entitled to rely on Timmons' alleged misrepresentations, he was not, in this case, because of his superior knowledge regarding the existence of wetlands on the property. This raises the factual issue discussed earlier regarding Cadogan's actual knowledge and the extent of any knowledge he possessed. This issue need not be considered in too much detail for it is clear that a finding that there was in fact a misrepresentation would preclude a finding that Cadogan's reliance on Timmons was unjustified in view of his actual knowledge of facts.

The relative superiority of Cadogan's knowledge to Timmons' is not relevant *per se.* Nor can any inference regarding justifiable reliance be drawn from a demonstration that a prudent purchaser using reasonable care could have ascertained the presence of wetlands. *Restatement (Second) of Contracts* § 172 comment a (1981). Even assuming that Cadogan's knowledge and expertise were superior to Timmons', the relevant consideration is whether Cadogan was reasonable in placing reliance on Timmons' representations. This determination would appear to rest on whether Timmons presented himself to Cadogan as an experienced real estate investor.

The doctrine of mutual mistake dispenses with the concept of justifiable reliance. A party may be barred from subsequently seeking rescission of a contract on grounds of mistake, however, when, by express provision of the contract or by virtue of the bargaining process, a party agrees to bear the risk of a mistake. The *Restatement (Second)* enumerates three methods by which risk is allocated to a party in a contract: (1) by express agreement, or (2) by implication through a party's willingness to proceed with a contract when he is aware that he lacks complete information with respect to a specific issue, or (3) by the court after evaluating what is reasonable under the circumstances. *Id.* at § 154. The first of these possibilities will be discussed in the next section. The third ground for allocating risk to a party is simply not applicable in these circumstances. There is nothing about the mistaken facts in this case to merit judicial allocation of risk based on either ordinary commercial practices or unusual policies considerations.

Defendants focus on the second test for inferring that risk of a particular mistake has been allocated to one of the parties through their argument that the purchasers bore the risk of the subdivided lots encroaching on wetlands. Purchasers bore this risk, according to the defendants, because of the understanding among the parties that Cadogan would take responsibility for securing all necessary building permits during the period between the option's expiration and the closing. The argument

---

**12.** One of the alleged misrepresentations ignored in the text concerns Timmons' assurance to Cadogan that the Corps would look favorably upon a permit application for an in-bay marina. Without consideration of additional facts surrounding the making of the statement, the statement, if honestly made, would appear to be an opinion which is simply not actionable for innocent misrepresentation.

continues that, in failing to secure Corps' approval prior to closing, the purchasers freely accepted the risks of proceeding with the contract. Plaintiffs offer two legally cognizable responses. First, if any such understanding did exist, it required only that plaintiffs employ their best efforts for which there is evidence that they did. They tried to arrange a meeting with the JPPP which included a Corps' representative, but the earliest available date was not until twelve days after the closing. Secondly, plaintiffs contend that any understanding regarding the procurement of permits applied exclusively to permits that the plaintiffs understood were necessary to obtain. Plaintiff were simply not aware of the extent of the Corps wetland jurisdiction on their property. Both of these responses raise matters of fact which will require the Court to consider the issue of allocation of risk at trial.

5. *Exculpatory Clause in Contract of Sale.*

■ Defendants contend that paragraph 11 of the Contract of Sale dated November 15, 1983, the so-called "no reliance" clause, expressly relieves them from any contractual liability to plaintiffs in the event of any mistakes or misrepresentation.[13] Thus, even if plaintiffs have succeeded in establishing the requisite elements for equitable relief on grounds of mutual mistake or misrepresentation, plaintiffs are barred from relief by expressly bargaining away the right to disavow the risk of any mistake or to claim reliance on any misrepresentation by the seller. Plaintiffs contend that the Contract of Sale is not a binding instrument, and even if the contract were valid, this Court should refuse to enforce

paragraph 11 as a matter of equity which frowns on the use of boilerplate to defeat the substantive rights of parties to contracts.

Plaintiffs argue that the Contract of Sale cannot be considered binding because the contract was superceded either by a novation or an accord arising out of the settlement on March 30, 1984. According to plaintiffs, the Agreement and Bill of Sale dated March 30, 1984, is a superceding instrument. This argument is patently unpersuasive because, according to the purchasers' own attorney, the Agreement was purposely never executed by the purchasers.

The apparent invalidity of the Agreement, however, is not controlling as to the issue of novation or accord. The Contract of Sales may have been superceded by the signed Amendment to the Ocean River Joint Venture Partnership or by an oral agreement entered into at the time of the settlement. Several facts surrounding the closing would seem to support an inference of an implied novation or accord. The exchange of performances at the settlement significantly differed from the agreed on exchange of performances in the Contract of Sale. The transaction's structure changed from one involving the conveyance of real property to one involving the exchange of personal property. In addition, the financing of the transaction was changed from a cash-only transaction to a mixture of cash and promissory notes secured by real property. Finally, the final transaction involved different parties; the Contract of Sale envisioned a sale between two partnerships, while the transaction ultimately involved a sale between the three

---

**13.** Paragraph 11 reads:

INSPECTION AND ACCEPTANCE

11. It is understood that the Purchaser has inspected the property, or hereby waives the right to do so, and that he has agreed to purchase it as a result of such inspection satisfactory to him, and not because of or in reliance upon any representation made by the Seller or any other officer, partner or employee of the Seller, or by Agent of the Seller or any of the latter's salesmen or employees or by cooperating broker, if any, or any of his

salesmen or employees and that he has agreed to purchase it in its present condition, unless otherwise specified herein. It is further understood that this agreement contains the whole agreement between the Seller and the Purchaser and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. Furthermore, this agreement shall not be altered, amended, changed, or modified, except in writing executed by the parties hereto.

Delaware corporate defendants and the two Maryland corporate plaintiffs.

These facts are undisputed, and thus, it is possible to conclude as a matter of law the Contract of Sale was superceded by contractual obligations arising out of the settlement on March 30th. Nevertheless, there remain several unresolved factual matters which preclude partial summary judgment for plaintiffs with respect to this issue. The exact terms of the superceding contract are not apparent from the record and therefore additional testimony is required to establish the terms of the contract that was entered into. Moreover, there is a fundamental ambiguity in plaintiffs' position as to whether the superceded contract is a novation or an accord. The legal significance of this distinction harbors apparently unforeseen consequences for plaintiffs.

■ A novation arises out of a substituted contract involving different contracting parties. As a substituted contract, a novation discharges the obligations arising out of the old contract without regard to performance by the parties to the new contract. Thus, rescission of a substituted contract still extinguishes all obligations arising under the original contract. An accord, on the other hand, discharges the obligations under the old contract subject to the obligee's performance under the accord. *See Restatement (Second) of Contracts* §§ 279–81 (1975). Since plaintiffs seek rescission of the latter contract, treating the latter contract as an accord could arguably reinstate the original contract, namely, the Contract of Sale.

Whether the superceding contract is a novation or an accord is a matter of interpretation that would necessarily involve resolving disputed issues of fact. While the general rule is that there is a preference for construing the new contract as an accord rather than as a substituted contract when doubt exists, certain facts in this case appear to support a contrary inference. An accord typically involves a new contract designed to relieve an obligee's preexisting duty under another aprtially performed contract. This case involves, instead, a significant modification of the terms of an executory contract. The performance of both parties was governed exclusively by the new contract.[14]

■ Regardless of the validity of the Contract of Sale as a whole, the plaintiffs also contend that this Court should refuse to give effect to paragraph 11. In *Norton v. Poplos,· supra,* the Delaware Supreme Court held that a similar provision in a contract conveying ownership of a commercial building could not bar an action grounded on innocent misrepresentation. The rule adopted by the *Norton* court stems from two different concerns. First, there is a general aversion to enforcing "boilerplate" clauses because of the belief that they were not the subject of genuine bargaining. Secondly, enforcement of such "boilerplate" clauses would lead to results which courts have come to consider inequitable.

The record before the Court in this case raises these same concerns. Notwithstanding the fact that the buyer's real estate agent provided the form contract, the Contract of Sale was a particularly inapt instrument for conveying undeveloped property. The contract was designed for the sale of single family residential dwellings as evidenced by paragraph 13 which concerns the respective rights and duties of seller and purchaser in the event that termites are discovered. Admittedly the lack

---

**14.** *Restatement (Second) of Contracts* § 279 comment a, illustration 2 poses a situation which resembles the kind of changes made to the original contract encountered here. In that example, A originally agrees to build a specific building for a fixed amount of money. Later, prior to performance, A and B change the terms of the contract so that A promises to build a different building and B promises to pay a higher price.

The distinguishing feature in the examples found in the *Restatement (Second)*, between substitution in § 279 and accord in § 281 appears to be whether the new contract is mutually advantageous to the contracting parties in which case the change is deemed substitution or a compromise of the obligor's rights in return for some guarantee of the obligee's performance in which case the modification is deemed an accord.

of legal sophistication among the parties in this three million dollar transaction is somewhat surprising, but it only reinforces the Court's basic inclination to deny any legal effect to such clauses.

Secondly, giving effect to such a clause would also lead to a gross inequities. If the loss in property value suffered by purchasers is as great as they allege, then enforcing the "no reliance" clause would leave sellers with a substantial profit as a benefit from innocent misrepresentations they made, or at best, arising from the mutual mistake of the parties. To allow the loss to be entirely allocated to the purchasers would violate principles of fair dealing.

The situation in this case is no different than the mistake with respect to zoning at issue in *Norton*. Accordingly, this federal district court must regard the Delaware Supreme Court's analysis of the issue as definitive. Although the holding in *Norton* technically applies only to actions of innocent misrepresentation, the same principles also argue for a similar rejection of such boilerplate as a defense in actions for mutual mistake. *But see Miller v. Varilek*, 129 Mich.App. 703, 342 N.W.2d 94 (1983) ("as is" clause barred action for mutual mistake). By definition, mutual mistake arises in situations beyond the contemplation of the contracting party. *See* C. Fried, *Contract As Promise: A Theory of Contractual Promise* 58–67 (1981). Although courts will enforce a specifically tailored provision which results from honest bargaining, in allocating the risk of unforeseen risks, allpurpose boilerplate provisions, such as paragraph 11, should be regarded as ineffective because they lack adequate notice of what is being bargained for. Thus, paragraph 11 of the Contract of Sale, even if the contract is valid, has no bearing on the plaintiff's present actions for mutual mistake or innocent misrepresentation.

6. *Affirmance of The Transaction.*

The *Restatement (Second) of Contracts* § 380 provides:

(2) The power of a party to avoid a contract for misrepresentation is lost if after he knows or has reason to know of the mistake or of the misrepresentation if it is non-fraudulent or knows of the misrepresentation if it is fraudulent, he manifests to the other party his intention to affirm it *or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.* (emphasis added).

■ This section reflects one aspect of the doctrine of election of remedies. Defendants implicitly rely on this doctrine to argue that plaintiffs' conduct, after learning the full extent of the wetlands encroachment problem, should bar their seeking avoidance of the transaction. While plaintiffs have never expressly manifested a willingness to affirm the transaction, defendants contend that plaintiffs' acts with respect to the acquired property are inconsistent with disaffirmance, and thus, they have waived any remedy for the mistake or misrepresentation. Defendants point to three of plaintiffs' acts as inconsistent with their claim of rescission: (1) the property has been resubdivided; (2) loans for development of the Ocean River Acres project have been diverted to other projects without the lenders' approval; and (3) roughcut roads have been established on the property.

The illustrations accompanying § 380 imply that such acts should constitute a waiver of the purchasers' right of avoidance. Illustration 4 offers the following example:

A contracts to sell and B to buy a tract of land, the value of which had depended mainly on the timber on it. Both A and B believe that the timber is still there, but in fact it has been destroyed by fire so that the contract is voidable by B on the ground of mistake. See Illustration 1 to § 152 [section on mistake]. On discovery of the mistake, B tenders a deed back to A, who refuses to accept it. B continues to occupy and use the land. B's conduct amounts to affirmance and he is precluded from avoiding the contract.

Election of remedies so construed is harsh medicine. One could surely challenge the mechanical way in which a party is deemed to have affirmed a transaction in a legal

system in which a dispute takes a minimum of six months to resolve and in which it is not uncommon to find lawsuits that last two years or longer. Election, in the context of mistake or innocent misrepresentation, imposes particularly severe hardships on a purchaser because of the absence, in most cases, of a remedy for damages. A purchaser may find himself in the difficult position of having to choose between forfeiting his cause of action or risk incurring opportunity costs in the event his lawsuit is unsuccessful.

In spite of these reservations, there are strong policy considerations that justify the rule. Of these, the most important is the perception that a permissive rule toward purchasers would allow a purchaser to exploit his position against sellers unfairly. A purchaser could threaten rescission while continuing to derive benefits directly from control of the property in question and indirectly from potentially advantageous changes in market values. Another significant consideration militating against a permissive rule is the deleterious effects such a rule would have on principles of contract law. First, the willingness of courts to actively intervene in contractual disputes for reasons of equity diminishes the certainty of the contracting process. Moreover, although *caveat emptor* as a principle of contract law is moribund, there is some truth to the assertion that if it is too easy to overturn a contract, the incentives of the parties to protect themselves through their own diligence is diminished. In addition to these fundamental objections to a permissive rule, there is the practical problem courts will increasingly encounter when they are unable to restore the status quo among parties through rescission.

In practice, courts in jurisdictions other than Delaware have tempered their application of a strict rule of election with equitable considerations. Even in cases in which the purchasers' right to rescind is deemed to have been waived, courts have been at pains to emphasize circumstances giving rise to suspicion regarding the purchasers' motives. *See, e.g., Derouin v.*

*Granite State Realty, Inc.,* 123 N.H. 145, 459 A.2d 231, 233 (1983) (lower court's decision denying rescission made after considering all the circumstances); *Watson v. Fantus,* 275 Or. 605, 552 P.2d 251, 253–54 (1976); *Ryan v. Brady,* 34 Md.App. 41, 366 A.2d 745, 751–52 (1976). In a recent decision on facts similar to those in this case, Maine's highest court indicated that the reasonability of plaintiff's conduct "under the circumstances" supported a district court's finding that a plaintiff had not waived his right to rescission because of delay in making his intention with respect to performance known. *See DiBiase v. Universal Design & Builders, Inc.,* 473 A.2d 875, 879 (Me.1984).

This Court's function, however, is not to evaluate the wisdom of § 380 of the *Restatement (Second),* but rather to determine whether Delaware's highest court would agree with the position expressed therein. Although there can be little doubt that Delaware courts subscribe to the doctrine of election of remedies, this Court entertains reservations whether the doctrine as applied in § 380 is in accord with Delaware practice. In applying a different aspect of the doctrine of election, Delaware's Supreme Court opined that the nature of the doctrine involved "any decisive act of a party ... indicating an intent to pursue one remedy rather than the other." *Stoltz Realty Co. v. Raphael,* 458 A.2d 21, 23 (Del.1983) (*quoting* 28 C.J.S. *Election of Remedies* § 11, at 1077 (1941)). Such an approach indicates that election should be governed by a trial court's evaluation of the significance of the acts of the party against whom the doctrine is asserted.

While no Delaware cases directly on point have been found, Delaware courts have addressed the issue of the availability of rescission when a party has delayed bringing his suit. These cases suggest a willingness to have trial courts consider the availability of equitable remedies only after carefully weighing the equities presented in the case. This approach is contrary to the spirit of the strict rule contained in § 380 of the *Restatement (Second).*[15] In

---

**15.** Section 381 of the *Restatement (Second)* is,

however, consistent with this approach. These

*Dugan v. Bosco,* 34 Del.Ch. 599, 108 A.2d 586 (1956), Chancellor Seitz held that plaintiffs, who had converted the house which they had purchased into apartments, could still seek rescission despite the Court's inability to restore parties to the status quo. The Court reasoned that the modification in the house's structure did not, by itself, alter the plaintiff's right to rescission; rather the change was a fact the Court would take into account in fashioning relief. *Id.* 108 A.2d at 588.

In another case, *Collins v. Burke,* 418 A.2d 999 (Del.1980), the Delaware Supreme Court considered whether a plaintiff's undue delay in seeking reformation of a real estate contract barred relief. The court rejected any conclusion that precluded plaintiff's action in the absence of a specific showing of a detrimental change of position as a result of the delay.

There is no apparent reason why an approach similar to the one adopted by Delaware courts in ascertaining whether there has been undue delay should not also be employed in determining whether the acts of a party should be construed as an affirmance of the contract. Surely the policies discussed earlier that support a strict rule do not provide any justification for the use of two unrelated standards in this area. The potential for unfairness to sellers is not ignored under such an approach, but rather represents a factor courts should consider before ordering rescission. Similarly, although such an approach introduces some uncertainty into contractual relations, it is obvious that the use of a more permissive approach in the context of delay has not essentially undermined adherence to principles of contract.

Accordingly, the Court believes that Delaware law requires this Court to undertake a more careful examination of the plaintiffs' actions following plaintiffs' discovery of any mistake or alleged misrepresentation. Only then can the Court proceed to evaluate the significance of those actions and determine whether plaintiffs are entitled to rescission.

An order will issue in conformity with this opinion, denying the bulk of both plaintiffs' and defendants' motions for summary judgment. Partial summary judgment for plaintiffs, however, is appropriate with respect to the legal questions, presented by defendants' defenses based on agency, fraud and contract.

---

sections do not explain why any act in a manner inconsistent with disaffirmance precludes rescission while the measure of what a reasonable

amount of time is, involves a careful consideration of the equities of the case.