**ROADMASTER INDUSTRIES, INC., Plaintiff,**

v.

**COLUMBIA MANUFACTURING COMPANY, INC., et. al, Defendants.**

Civ. A. No. 91–CV–30095–MAP.

United States District Court, D. Massachusetts.

Aug. 2, 1995.

C. Brian McDonald, Bulkley, Richardson & Gelinas BayBank Tower, Springfield, MA, David H. Wollins, Brenman, Raskin, Friedlob & Tenenbaum, P.C., Denver, CO, Michael O'Neil, Robert M. Kluchin, Keck, Mahin & Cate, Chicago, IL, David E. Schaper, Roadmaster Corp., Gen. Counsel, Rosemont, IL, for Roadmaster Industries, Inc.

Michael J. Rye, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Daniel W. Patterson, Craig E. Stewart, William C. McClearn, Holland & Hart, Denver, CO, for Columbia Mfg. Co., Inc.

William P. Hadley, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Michael J. Rye, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Daniel W. Patterson, Craig E. Stewart, William C. McClearn, Holland & Hart, Denver, CO, for Modern Holdings, Ltd., Kenneth Howard, John McFadden, Emil Stang, Richard Huntoon, David Stevens, Bruce Turcotte, Richard Saloomey, Dieter Kaesgen, David Hessler, David Campbell and MTD Products, Inc.

William P. Hadley, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Michael J. Rye, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, for Peter Flink.

C. Brian McDonald, Bulkley, Richardson & Gelinas, Springfield, MA, Richard H. Goldberg, David H. Wollins, Brenman, Raskin, Friedlob & Tenenbaum, P.C., Denver, CO, Michael O'Neil, Robert M. Kluchin, Keck, Mahin & Cate, Chicago, IL, David E. Schaper, Roadmaster Corp. Gen. Counsel, Rosemont, IL, for Henry Fong, Thomas Itin.

*MEMORANDUM REGARDING PLAIN-TIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

(Docket No. 44)

PONSOR, District Judge.

## I. *INTRODUCTION*

In July of 1991, Roadmaster Industries rescinded its agreement to purchase a bicycle manufacturing plant owned by Columbia Manufacturing Company after it determined that hazardous pollutants had contaminated the soil and groundwater at the facility. The stock purchase agreement signed by the parties contained a series of provisions that expressly warranted that certain hazardous wastes—by-products of the facility's manufacturing processes from previous years—no longer contaminated the soil or groundwater. In a six-count complaint, Roadmaster Industries alleges that Columbia Manufacturing breached the stock purchase agreement, fraudulently misrepresented and concealed the fact that toxic wastes still contaminated the Columbia facility and violated state and federal securities laws.

The matter is now before the court on the plaintiff's motion for partial summary judgment on its contract claim for justifiable rescission and tort claims alleging fraudulent misrepresentation and fraudulent concealment. As will be seen, the undisputed facts, even when viewed in a light most favorable to the defendants, unquestionably establish defendants' liability on the breach of contract and fraudulent misrepresentation claim. However, the record does not as a matter of law establish any fraudulent concealment.

The court's reasoning and the undisputed factual findings supporting this decision are set forth below.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of summary judgment is to permit the court to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required on the claims being examined. *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 793–794 (1st Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).

The First Circuit has described the "rhythm" of summary judgment practice as follows: The movant must first aver an absence of evidence to support the non-moving party's case. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994), quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990), citing and quoting, *inter alia, Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The burden then shifts to the party opposing summary judgment to establish the existence of at least one fact issue which is both "material" and "genuine". *Id.* An issue is genuine if it requires resolution by a factfinder because it may reasonably be resolved in favor of either party. *Id.* A material issue is one that affects the outcome of the suit, i.e. "an issue which, perforce, needs to be resolved before the related legal issues can be decided." *Id.*, quoting *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). The non-movant may not defeat a properly supported motion for summary judgment by relying on mere allegations, improbable inference or evidence that is not significantly probative; definite competent evidence is needed to defeat the motion. *Id.*

■ In cases such as this one, where intentionality or other state of mind issues are contained in an element of a claim, "summary judgment is vested with more than the usual difficulty." *Stepanischen v. Merchants Despatch Transp.*, 722 F.2d 922, 928 (1983). Typically, resolution of such issues involves credibility determinations for the jury or factfinder. *Id.* Nonetheless, the nonmovant must still indicate that he or she can produce the requisite quantum of evidence to reach the jury on the state of mind issue. *Id.*

The ultimate question is whether the issues are "sufficiently open-ended to permit a

rational factfinder to resolve the [liability] issue in favor of either side." *National Amusements v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995).

## III. *FACTUAL BACKGROUND*

The facts set forth below, unless otherwise noted, are undisputed and presented in a light most favorable to the nonmovant defendants.

Plaintiff Roadmaster Industries, Inc. ("Roadmaster") is a Delaware corporation that manufactures bicycles and other products at its plant in Olney, Illinois. Defendant, MTD Products, Inc. ("MTD"), is an Ohio corporation which owns and operates companies throughout the United States and the world.

The dispute between the parties involves a transaction to purchase the Columbia manufacturing facility (the "facility") located in Westfield, Massachusetts. MTD purchased the Columbia facility in 1976 and operated it for eleven years. In 1987, certain officers of MTD and upper level management of the facility formed the Columbia Manufacturing Company ("Columbia") and purchased the facility from MTD. On March 6, 1990, Columbia and Roadmaster signed a stock purchase agreement (the "Agreement") to transfer ownership of the facility to Roadmaster. The shareholders of Columbia, who purchased the facility from MTD and then sold it to Roadmaster, are also named as defendants in this dispute.

### A. *The Columbia Facility*

For many decades, the Columbia facility had been used to manufacture various metal products including bicycles, lawnmowers and school furniture. When the facility was fully operational, the electroplating processes used in the manufacture of chrome-plated bicycle and furniture parts generated large quantities of a metal hydroxide sludge. The toxic constituents of the sludge included hexavalent chromium, cadmium, nickel and cyanide, all currently defined as hazardous substances and regulated by state and federal environmental laws.

From 1970 until 1983, wastewater used in electroplating was treated at an on-site facility and the residual toxic sludge was disposed of by dumping it into two man-made "lagoons" on the facility property. The lagoons were lined with a two-foot layer of sand and intended as permanent storage sites for the sludge. After 1983, the sludge was hauled off-site, but the wastewater was still treated on-site and discharged into local sewers and a nearby river.

### B. *Environmental Contamination*

In 1971, when Columbia first deposited the hydroxide sludge in the on-site lagoons, this was considered a satisfactory method of disposal in compliance with applicable laws and regulations. However, in 1976 Congress enacted the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq.,* creating a "cradle to grave" system for managing hazardous wastes. Subsequently, pursuant to the RCRA and parallel Massachusetts law, Columbia was classified as a hazardous waste facility and MTD was required to obtain a permit from the EPA to continue using the lagoons as storage receptacles for hazardous wastes. At that point, MTD elected to discontinue using the lagoons and retained the environmental engineering firm of Tighe and Bond to assist it in complying with RCRA procedures for closing the lagoons.

During the 1980's, as a result of the enactment of more stringent state and federal environmental laws, the Massachusetts Department of Environmental Quality and Engineering ("DEQE") and the U.S. Environmental Protection Agency ("EPA") carried out an investigation to determine whether the Columbia facility was in compliance with applicable environmental laws regulating the storage, handling and disposal of the hydroxide sludge and other regulated industrial toxins. Other pollutants used in manufacturing created additional environmental problems at the facility. Volatile Organic Compounds (VOC's), specifically trichloroethylene and tetra-chloroethylene, were used at the facility in the course of manufacturing and stored and disposed of on Columbia property. VOC's are toxic substances, the use of which is closely regulated by federal and state law.

In 1983, in an initial attempt to comply with environmental laws, MTD had more than 670,000 pounds of hydroxide sludge excavated from the two lagoons and disposed of at an off-site waste storage facility. In September 1983, the DEQE informed Columbia that the closure plan Tighe and Bond developed was inadequate. At that time MTD, had no plan to treat or remove groundwater below or downgradient from the lagoons.

The DEQE was dissatisfied with the proposed groundwater monitoring methods and doubted that the Tighe and Bond plan would ensure detection of hazardous materials that might migrate from the lagoons into the surrounding soil and aquifer. DEQE required that additional monitoring wells be installed at the lagoon sites. A DEQE memorandum to MTD expressly prohibited backfilling of the lagoons until a final closure plan was approved by the agency. Despite this purported ban, MTD soon after had the lagoons backfilled without formal written authorization from DEQE and before complying with RCRA guidelines. MTD contends that DEQE officials responsible for the monitoring and clean-up oversight knew that MTD was backfilling the lagoons and gave their verbal approval to do so to facility management. *See* Deposition of Kenneth Howard, Vol. IV at 65, Ex. 1, Appendix to Defendant's Opposition to Plaintiff's Motion for Summary Judgment.

In any case, in March of 1984, MTD submitted to DEQE a Revised Closure Plan for the lagoons which included plans for installing additional monitoring wells at the facility. DEQE remained dissatisfied with the proposed remedial and monitoring efforts contained in the Revised Closure Plan and, in November of 1984, entered an administrative order relating to the lagoons. *See In re MTD Products, Inc.,* File No. HW 84–11[1], Ex. 17, Vol. I, Appendix to Plaintiff's Motion for Summary Judgment. The thirteen-page order initiated an administrative proceeding against MTD and stated that there were statistically significant increases in contaminants in the monitoring wells downgradient from the lagoon. The order also stated that soil samples showed cyanide contamination of the soil, which give the department a reasonable basis to suspect that cyanide waste was disposed of in the ground at the facility.

In June of 1985, rather than face an administrative adjudication of these issues, MTD signed and agreed to abide by a DEQE consent decree substantively identical to the 1984 administrative order, No. HW 84–11, discussed above. Ex. 18, Vol. I, Appendix to Plaintiff's Motion for Summary Judgment (hereinafter the "1985 decree"). The 1985 decree acknowledged the history of MTD's noncompliance with environmental regulations and the existence of soil and groundwater contamination at levels in excess of allowed federal standards. The 1985 decree required MTD to continue monitoring and reporting on contamination at the facility in compliance with RCRA and state post-closure regulations for hazardous waste sites.

In May, 1986, pursuant to the 1985 consent decree, MTD had Tighe and Bond prepare an interim progress report for the DEQE. *See* Appendix, Vol. I, Ex. 3. This report indicated that significant concentrations of cyanide, hexavelent chromium, nickel and VOC's were present in the groundwater and soil at the facility in levels exceeding federal drinking water standards. · *Id.* at 3–12 through 3–19; Appendix, Vol I, Ex. 2, ¶ 16.d.

In the area around the lagoons, cyanide concentrations in the soil ranged from 100 to 1000 parts per million (ppm), well in excess of federal standards. The groundwater in the vicinity of the lagoons contained a host of other regulated contaminants in concentrations exceeding the Maximum Contaminant Levels (MCLs) permitted by the Safe Drinking Water Act (SDWA), 42 U.S.C. §§ 300f to

---

1. The DEQE administrative file HW–84–11 was referenced in Schedule M of the Stock Purchase Agreement. But in the course of the stock transaction Columbia never provided to Roadmaster documents from this file. According to plaintiff, its due diligence search revealed that the file contained thousands of documents kept in numerous locations throughout the state.

The entire case file has not been introduced as an exhibit in this litigation by either party. However, plaintiff's Exhibits 3, 17, 18, 19, 22, 23, 24, 26, 30, 31, and 33, as well as defendants' Exhibits 5 and 6 were taken from the DEQE file. Affidavit of Michael J. Rye, Ex. 8, Defendant's Appendix.

300j–11; 40 C.F.R. § 140.11. The federal MCLs establish the maximum permissible quantity of a contaminant in water that is delivered to any user of a public water supply regulated by the SWDA. These MCLs have been adopted by the RCRA. *See* 40 C.F.R. § 264.94, Subpart F. For remedial purposes under the RCRA, EPA policy requires that all contaminated underground sources of drinking waters should be treated to applicable MCL levels. App. Vol. I, Ex. 2. The Massachusetts DEQE designated the groundwater in the vicinity of the lagoons as a Class I aquifer, usable as a source of high quality potable water suitable for human consumption, were it not for its present state of contamination.

In 1986, Tighe and Bond determined that the following contaminants were in the groundwater beneath the Columbia facility in levels exceeding permissible federal standards. Concentrations are listed in parts per billion or ppbs.

> Trichloroethylene: permissible MCL of 5 ppb; highest MCL—1660 ppb

> Tetrachloroethylene: permissible MCL—5 ppb; highest MCL—289 ppb

> 1,2, Dichloroethylene: permissible MCL of 100 ppb; highest MCL—1600 ppb

> Vinyl Chloride: permissible MCL of 2 ppb; highest MCL—27 ppb

> Chromium: permissible MCL of 100 ppb; highest MCL—59000 ppb

> Cadmium: permissible MCL of 5 ppb; highest MCL—27 ppb

*See* Plaintiff's App. Vol. I, Ex. 3, Tighe and Bond May 1986 Interim Report; *see also,* Vol. I, Ex. 2, U.S. EPA Determination of Endangerment at 3–6.

On June 3, 1986, DEQE wrote to MTD stating that the Interim Report was deficient and that MTD was in violation of the 1985 consent decree. App. Vol. II, Ex. 30. Among the deficiencies noted were omissions of data samples that reported the levels of cyanide and VOCs at numerous monitoring wells. Also absent from the report was an assessment of possible effects on surface water downgradient of the site. *Id.* DEQE determined that the interim report lacked an adequate proposal for further investigation of the extent of soil and groundwater contamination, noting that the boundaries of the toxic plume in the groundwater had not yet been discovered. DEQE also stated that MTD had not provided a proposal for the containment and removal of hazardous materials on the site as required by Mass.Gen.L. ch. 21E.

On October 30, 1986, in response to the deficiencies noted in the June DEQE letter, Tighe and Bond prepared a supplement to the May, 1986 progress report. This report to the DEQE further documented the extent of the contamination, indicating that an underground plume of chromium and VOCs had migrated beyond the property boundary of the facility. *See* App. Vol. II, Ex. 31.

During the fall of 1986, in the course of its ongoing monitoring of the Columbia facility, DEQE accumulated evidence that led the agency to conclude that either MTD or facility management had tampered with the monitoring wells to reduce contaminant levels in the well water samples. On one occasion, DEQE personnel found a well uncovered and a garden hose coming from a facility building running into the well casing. App., Vol. II, Ex. 27. DEQE agents also suspected that sodium metabisulfate was being injected into the wells after finding traces of a white powder thought to be this chemical immediately adjacent to several wells and on the well's steel casing. This chemical is normally used in waste water treatment to convert highly toxic hexavalent chromium to its less toxic form, trivalent chromium. *Id.* Injecting sodium metabisulfate into the monitoring wells would create the appearance in the well water samples that the chromium contamination of the groundwater was of the less toxic variety. MTD officials admitted flushing water into the monitoring wells as part of their attempt to treat the groundwater at this site by running it through the facility's waste treatment facility. *See* Deposition of Kenneth Howard, Vol. V, at 128–141, Vol. II, Plaintiff's App.

On October 27, 1986, these findings and the previous determination that MTD was in violation of the consent order led DEQE to request that the Massachusetts Attorney General's office take over prosecution of the

case. DEQE Memo to Assistant Attorney General Martin Levin, Ex. 28, Vol. II, Plaintiff's App. DEQE alleged that MTD/Columbia unlawfully tampered with the monitoring wells and fraudulently concealed from a state agency evidence of hazardous contamination at the facility, all in violation of Mass.Gen.L. ch. 21E, § 8. *Id.* In June 1987, DEQE also locked the wells to prevent any potential future tampering. *Id.* However, a grand jury investigation of MTD did not lead to a criminal indictment.

In 1987, on the heels of this investigation, MTD took a series of steps to effect a leveraged buy-out, "spinning-off" the Columbia facility as a separate entity, the Columbia Manufacturing Company, Inc. The shareholders of Columbia Manufacturing were the local management of the facility and certain top-level officers of MTD. MTD officers arranged financing for this transaction with the Bank of New England, borrowing money to infuse the Columbia Manufacturing Company with enough capital to purchase the facility from MTD.

On July 29, 1987, in the course of these dealings, Tighe and Bond wrote a letter to the bank stating that there was soil and groundwater contamination at the site. The letter specifically stated that there was a chromium and/or VOC contaminant plume in the groundwater and cyanide contamination of the soil. Tighe and Bond opined that they expected these conditions would require remediation (i.e. cleanup) measures, to "abate the migration of contamination of the premises." App., Vol. II, Ex. 35. The estimated costs of remediation were between $420,000 and $900,000. A July 30, 1987 draft letter to the bank on MTD stationary from John McFadden, MTD officer and president of the newly formed Columbia Manufacturing Company, stated that the company had reviewed the Tighe and Bond letter to the bank and was aware of the clean-up cost estimates state therein. Ex. 36, Vol. II, Plaintiff's App.

In November 1987, subsequent to MTD's sale of the Columbia facility, DEQE performed additional groundwater sampling at the facility which showed, *inter alia,* levels of hexavalent chromium at twenty-five milligrams per liter (mg/l) present in at least one well, clearly in excess of the legal limit of .05 mg/l. VOCs, in particular trichlorethylene, were also found in levels well above regulatory guidelines. On December 31, 1987, Thomas Clouture of Tighe and Bond sent a memorandum to Ken Howard, then president of Columbia Manufacturing, which informed the company of the November, 1987 DEQE test results.

In September of 1988, the EPA conducted an on-site inspection of the Columbia facility and identified thirty-six solid waste management units (SWMUs) in order to determine whether future corrective action was required at the site. A large proportion of these SWMU's were later found to contain excessive levels of toxins in violation of the RCRA and became the target of future corrective actions by the EPA. *See* App., Vol. II, Ex. 40, EPA's RCRA Facility Assessment of the Columbia Manufacturing Facility, May 1989.

Significantly, the EPA inspection identified further areas of concern that were not the subject of the 1985 DEQE administrative adjudicatory proceeding, HW 84–11, and the resulting consent order. Most notably, the EPA identified a fire pond on the south side of the facility and "aesthetic pond" on the east side of the facility as sources of potential hazardous waste contamination. Neither site was a subject of the 1985 DEQE consent order. In March 1990, EPA performed soil sampling at the aesthetic pond which confirmed the presence of chromium, copper, lead and nickel at MCL well in excess of federal and state standards. Ex. 2 at 6–7, Vol. I, Plaintiff's App. Groundwater in the vicinity of the fire pond was also sampled. It too was contaminated with chromium, cadmium and VOCs in excess of permissible MCLs. *Id.* at 7–8.

In November, 1989, While these EPA investigations were underway, Roadmaster began negotiations with Columbia Manufacturing to purchase the Columbia facility. A stock purchase agreement was signed by the parties on March 6, 1990. At no time during the negotiations did Columbia or any of its stockholders inform Roadmaster of the ongoing EPA inspections and investigation.

### C. The Stock Purchase Agreement: Environmental Representations and Warranties

Central to the issues raised by plaintiff's motion for partial summary judgment are certain provisions of the Roadmaster/Columbia stock purchase Agreement. In particular, two parts of the Agreement, § 4 and Schedule M, are at the center of this dispute. Ex. 1, Vol. I, Plaintiff's App. It is undisputed that these provisions were expressly drafted to take into account prior hazardous waste contamination of the Columbia property.

Section 4, entitled "Representations and Warranties by the Stockholders and by Columbia" states in relevant part:

To induce RMI to consummate the transactions contemplated hereby, the Stockholders and Columbia, jointly and severally, to the best of their knowledge and belief, represent and do agree as follows:

(w) *Environmental Issues.* Stockholders hereby represent and warrant that, with the exceptions set forth in Schedule M attached hereto and incorporated herein:

1. *Hazardous substance.*

(a) During the time since the Company acquired title to the property, no hazardous substance has been generated, treated, stored or disposed of at, on, or into the Property, and there has been no release into the environment of a hazardous substance on, at or into the property, except possibly for material that are referenced in Schedule M hereof.

(b) With regard to any exceptions to this paragraph (1) set forth in schedule M, any release of a hazardous substance into the environment at, on or into the Property has been sufficiently remedied to ensure that no hazardous substance currently exists in the soil at the Property or in the groundwater under the Property in concentrations which would necessitate removal or other treatment of the soil or groundwater under the Property either as a result of the requirements of any federal, state, county or local governmental agency or because said concentrations present a danger to the public health or welfare or the environment or to the value of the property of any adjacent landowner.

### 3. Compliance with Environmental Laws

Except as set forth in Schedule M attached hereto: (i) the Company is conducting and carrying on its businesses and affairs in full compliance with all Environmental Laws; (ii) all properties (real and personal) owned, leased, or operated by the Company comply with and conform in all respects to all applicable Environmental Laws; (iii) no real property owned, leased or operated by the Company is or has been included in, or is contiguous to, a site that is or has been designated by any state, local, or federal agency or body as a site or location requiring clean up, removal or remedy by reason of the release or threatened release of any Hazardous Substance into the environment; (iv) the products sold by the Company comply with and conform in all respects to applicable Environmental Laws; (v) there has never been any significant generation, release, discharge, storage, disposal, transportation, or containment of any Hazardous Substance on or from any portion of an land or buildings owned, leased, or operated by the Company, or on or from any portion of any other property contiguous thereto, in violation of any Environmental Laws; and (vi) the Stockholders are not aware of, and neither they nor the Company have received notice of, any significant past, present or future events, conditions, circumstances, activities, practices, incidents, actions, or plans deriving from the operation of the businesses of the Company or occurring at any property owned, leased, or operated by the Company, or at any property contiguous thereto, which may interfere with or prevent compliance or continued compliance with applicable Environmental Laws, or which may give rise to any common law [sic] or the [sic] legal liability, or which may otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study, or investigation based on or related to the manufacture, processing, distribution, use, emission, discharge, release, or threatened release into

the environment of any Hazardous Substance.

Ex. 1 at 9–10, Vol. I Plaintiff's App.

Schedule M, expressly referenced in § 4 and entitled "Compliance Exceptions to Environmental Issues," lists the following exceptions to the warranties in § 4(w):

1) Massachusetts Department of Environmental Quality (DEQE or its successor organization) Adjudicatory Proceeding File No. HW 84–11 and all proceedings and other matters relative to or in conjunction therewith.

2) *Natural Resources Defense Council, Inc. v. Columbia Manufacturing Company,* U.S. District Court, District of Massachusetts, Springfield Division, Case No. 89–30195–F, and all matters relative to or in conjunction therewith.

3) National Discharge Elimination Permit No. MA0001571 issued June 29, 1984, and any extensions or renewals thereof and any matters relative to or in conjunction therewith.

4) Any and all other Environmental or Hazardous Substance Permits or Authorization presently issued to or in the name of Columbia and any matters relative to or in conjunction therewith.

*Id.* at 31.

The Agreement expressly defined "hazardous substance" and "release" to have the same meanings as these terms have under federal law. *Id.* at 11.

### D. *Events after the signing of the March 6, 1990 Agreement*

The final closing was scheduled first for April 15, but was postponed for one month by agreement of the parties. App., Vol. I, Ex. 4. During the interim, Roadmaster hired an environmental consultant, ENSR, to conduct an inspection of the property and review previous environmental studies to insure that the conditions of the facility comported with § 4 of the Agreement. *See* App. Vol. I, Ex. 5. Among the documents reviewed by ENSR were the interim reports prepared by Tighe and Bond for MTD pursuant to the 1985 DEQE consent order referenced in Schedule M of the stock purchase agreement as File NO. HW–84–11. ENSR also pursued their investigation by speaking to EPA and DEQE officials and made efforts to review the Columbia files in the possession of these agencies. On May 14, 1990, ENSR filed a written Freedom of Information request with the EPA to see the Columbia files gathered pursuant to the RCRA.

On May 14, 1990, Thomas Itin, Roadmaster vice-president, faxed a letter to John McFadden at Columbia which said that "ENSR had advised us of a number of matters which have caused us a considerable amount of concern." App., Vol. II, Ex. 47. Itin expressed concern that Columbia had not been in compliance with EPA "requirements and permits." *Id.* Itin further noted that it had monitoring reports and correspondence which disclosed the presence of pollutants in Columbia's wastewaters. The letter expressed concern over a consent decree proposed in a suit initiated by the Natural Resources Defense Council against Columbia whereby Columbia would admit to polluting various waters and admit to liability for various permit violations. *Id.* The letter concluded by stating that Roadmaster needed another thirty-one days to evaluate these matters "not previously disclosed in the Agreement ... [to] negotiate amendments to the Agreement and to close this transaction." *Id.*

There was no closing on the Agreement on May 15, 1990 as previously scheduled. On May 22, 1990, representatives from Roadmaster, Columbia, Tighe and Bond, ENSR and MTD met at the facility to discuss matters related to environmental issues at the facility. Among the topics discussed were the January, 1990 EPA inspection pursuant to the RCRA and a citizens' suit against Columbia being pursued by the Natural Resources Defense Council. The record does not indicate that there was a resolution of outstanding issues related to § 4 of the Agreement at that time.

On June 19, 1990, Itin wrote again to McFadden stating that Roadmaster "has no obligation to close under the March 6 agreement. Based upon the material misrepresentations and failure to disclose material

facts to us ... we hereby elect to rescind the March 6 agreement." App. Vol. II Ex. 49.

On August 8, 1991, the EPA Regional Administrator, Julie Belaga, issued a "Determination of Endangerment" with regard to the Columbia facility and authorized the commencement of a civil action under the RCRA against Columbia Manufacturing Company. Ex. 2, Vol. I, Plaintiff's App.; *see also,* Vol. II, Ex. 50. Based largely on Tighe and Bond reports and DEQE/EPA data collected prior to the March 6, 1990 Agreement, EPA determined that releases of hazardous waste had occurred at the facility contaminating the groundwater in the vicinity of the facility and that these might present an imminent and substantial endangerment to health or the environment requiring corrective action. *Id.* at 9.

Subsequently, on behalf of the EPA, the Justice Department filed an RCRA action in Massachusetts federal district court against MTD and Columbia Manufacturing Company. The lawsuit was settled on June 28, 1993 pursuant to a consent decree published in the Federal Register on July 9, 1993. According to the terms of the consent decree, MTD and Columbia were fined $100,000. MTD and Columbia were required to compile a comprehensive plan (the RCRA Facility Investigation or RFI) to determine the extent of hazardous waste contamination at the facility and conduct a clean-up pursuant to federal law and the RFI. Tighe and Bond estimated that the cost of the remedial investigation and clean-up could exceed $1 million. Ex. 53, Vol. II., Plaintiff's App.

## IV. *DISCUSSION*

Based on these undisputed facts, Roadmaster asserts that summary judgment is required on its breach of contract claim and on its tort claims alleging fraudulent misrepresentation and fraudulent concealment. The plaintiff seeks a declaratory judgment stating that Roadmaster's rescission of the March 6, 1990 stock purchase agreement was proper and effective. In addition to declaratory relief, plaintiff seeks actual and exemplary monetary damages of at least $3,000,-000.

In their opposition to summary judgment, defendants (referred to collectively as "Columbia") challenge the legal standards for contract rescission employed by plaintiff. In essence, defendants argue that the breach of contract claim is meritless and is merely a reformulation of its tort claims. With respect to the tort claims, Columbia argues that summary judgment is not warranted because there are disputed issues of material fact.

As explained below, the undisputed facts viewed in light of the applicable legal standards justify plaintiff's decision to rescind the March 6, 1990 stock purchase agreement and also satisfy all the elements necessary to establish liability on the claim of tortious misrepresentation.

### A. *Breach of Contract*

■ Defendants raise a choice of law issue that must be addressed initially to resolve plaintiff's breach of contract claim. Section 6(e) of the stock purchase agreement states that the contract "shall be construed and interpreted according to the laws of the State of Delaware." Ex. 1, Vol. I, Plaintiff's App. Defendants nevertheless argue that, as a matter of law, plaintiff has no contract claim and that choice of law principles require that Massachusetts law be applied to resolve Roadmaster's claim of rescission for breach of environmental warranties. Columbia, in essence, argues that Roadmaster's contract claim merely restates its tort claim of misrepresentation. *See* Defendants' brief at 27. The court cannot agree with the defendants' choice of law argument or its approach to plaintiff's breach of contract claim.

■ First, the state of Delaware, based on widely accepted authorities on contract law, recognizes that a misrepresentation at the time of contract formation provides legitimate grounds to rescind a contract. *Norton v. Poplos,* 443 A.2d 1, 4 (Del.Supr.1982). Contrary to defendant's assertion, and separate and apart from any claims that may sound in tort, rescission may be employed as an equitable *contract* remedy. With respect to fraud or mistake providing the grounds for contract rescission, Delaware has adopted the rule in Restatement (Second) of Con-

tracts § 164. *Id.; Shore Builders, Inc. v. Dogwood, Inc.,* 616 F.Supp. 1004, 1012 (D.Del.1985). Expressly following the analysis of misrepresentation in sections 159–164 of the Restatement of Contracts, the Delaware Supreme Court has held that

> a material representation, innocently made, but nevertheless false, renders a contract voidable when one of the parties justifiably relies on the misstatement in making the contract.

*Shore Builders, Inc. v. Dogwood, Inc.,* 616 F.Supp. at 1004, citing *Norton v. Poplos,* 443 A.2d at 4.

■ Second, absent serious conflict with public policy, Massachusetts' courts generally uphold choice of law provisions in contracts. *Morris v. Watsco, Inc.,* 385 Mass. 672, 674, 433 N.E.2d 886 (1982); *Steranko v. Inforex, Inc.,* 5 Mass.App. 253, 270, 362 N.E.2d 222 (1977); *Comdisco Disaster Recovery Serv. v. Money Mgt.,* 789 F.Supp. 48, 52 (D.Mass. 1992). The defendant did not raise a public policy argument in its brief or at oral argument. Absent such an argument the court will not ignore the parties' choice of law. Delaware law will therefore be applied to resolve Roadmaster's breach of contract claim.

### 1. *Misrepresentations and Warranties*

The defendants' alleged misrepresentations in breach of the Agreement's warranties fall into two broad categories. First, as set forth in the fact section of this memorandum, it is uncontroverted that at the time the Agreement was signed, the soil and groundwater at the facility contained hazardous toxins at levels in excess of allowable federal standards. Some of the areas of contamination, most importantly the lagoons, had been the subject of scrutiny for many years and were referenced in Schedule M. Other areas of environmental degradation, most notably the fire pond and aesthetic pond were not referenced in the Agreement. Second, it is undisputed that throughout the Roadmaster/Columbia negotiations, the defendants knew that EPA was investigating the facility to determine the extent of the environmental degradation and failed to inform Roadmaster of these potential liabilities.

■ The first category of misrepresentations establishes a breach of § 4(w)1.(b) of the stock purchase Agreement. This subsection provided that any hazardous substances previously released from the facility were "sufficiently remedied to ensure that no hazardous substance currently exists in the soil at the Property or in the groundwater under the Property in concentrations which would necessitate removal or other treatment of the soil or groundwater either as a result of the requirements of any federal, state, country or local" government's environmental standards or because they posed a threat to human health or welfare or the environment.

Analysis of groundwater and soil samples performed by Columbia's environmental consultants, Tighe and Bond, established as early as 1986 that hazardous substances released from the facility had not been "sufficiently remedied" to satisfy federal environmental standards and still posed a threat to humans and the environment. Between the signing of the Agreement on March 6, 1990 and the time of the scheduled closing date, using this data and other information in the possession of EPA and DEQE, Roadmaster determined that the facility was not in the condition warranted in § 4(w)1.b. The scope of the contamination was amply documented in the two thick volumes of exhibits submitted with plaintiff's motion. These facts are undisputed and dispositive with respect to the breach of contractual warranties.

In response, defendants contend that Roadmaster is complaining about environmental conditions expressly excepted from the warranties in Schedule M. Columbia's reading of § 4 is that any prior release referenced in Schedule M was excluded from the warranties and cannot provide the basis for rescission.

A fair reading of Schedule M in the context of the whole of § 4 does not support Columbia's interpretation of the Agreement. Schedule M merely states what prior violations the parties agreed were excepted from the environmental warranties in the agreement. However, the only conclusion that can be drawn from § 4(w)(b) is that Columbia warranted that these past violations noted in

Schedule M *"had been sufficiently remedied"* to satisfy current environmental law.

The effect of this language was not to put Roadmaster on notice. Rather, its purpose was to guarantee that the previous releases of hazardous substances were no longer an environmental liability as defined by the Agreement and current laws and regulations. This was patently not the case at the time the Agreement was signed.

Columbia's interpretation of the Agreement takes into consideration only § 4(w)1.a and entirely ignores § 4(w)1.b, which warrants that any releases mentioned in Schedule M have been remediated and no longer violate federal or state environmental laws. No other reasonable interpretation of the warranties is possible.

■ A second category of misrepresentations breached warranties set forth in § 4(w)3 of the Agreement. This provision stated that, except as set forth in Schedule M, Columbia was in *full* compliance with federal and state environmental laws. This language set forth what can only be characterized as an exhaustive and comprehensive list of environmental warranties that went well beyond the environmental problems noted in Schedule M[2]. In § 4(w)3(vi), the Agreement provided, with respect to the facility, that

the Stockholders are *not aware of, and neither they nor the Company have received notice of* any significant past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans.... which may interfere with or prevent compliance or continued compliance with applicable Environmental Laws, or which may give rise to any common law or the legal liability, or which may otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study, or investigation based on or related to the manufacture, processing, distribution, use, emission, discharge, release, or

threatened release into the environment of any Hazardous Substance.

Ex. 1, Vol. I, Plaintiff's App. (emphasis added).

At the time this Agreement was signed, Columbia officials knew that in 1988 the EPA had identified a large number of additional SWMUs at the facility including two potentially major hazardous waste sites, the aesthetic pond and fire pond. Yet, § 4(w)(3) clearly warranted that defendants were "not aware of and had not received any notice of" any significant past, present or future events which might interfere with or prevent compliance with federal or state environmental laws.

Additionally, in early 1990, EPA conducted another investigation and determined the presence of chromium, copper, lead and nickel at MCLs well in excess of federal standards. There is no genuine dispute as to the fact that, immediately prior to and during negotiations with Roadmaster, repeated written communications with EPA and meetings with the agency's representatives placed defendants on notice of environmental problems which, at minimum, might have prevented compliance with environmental laws. As a matter of law, these communications served as notice to defendants.

The undisputed facts amply support plaintiff's contention that defendants were on notice that any one of a host of sites at the facility contained hazardous pollutants at levels violative of applicable environmental laws. These facts, summarized above and detailed in the fact section of this memorandum, unquestionably establish that Columbia breached the environmental warranties in the Agreement.

### 2. *Rescission*

■ The elements that must be established to rescind an executory contract for misrepresentation[3] are (1) that the misrepre-

---

**2.** In this motion, only item 1 of Schedule M pertains to the contamination caused by the lagoons and is at issue. Items 2, 3, and 4 of Schedule M pertain to Columbia's permit to discharge treated wastewater into an offsite river. The violations of the federal permit and a related lawsuit referenced in item 2 are not pertinent to the arguments of either party.

**3.** The *Norton* court defined misrepresentation as follows: "A misrepresentation need not be in the form of written or spoken words. Stated simply,

sentation was material, (2) that it induced the execution of the contract and (3) that the injured party justifiably relied on the misrepresentation. *Norton v. Poplos*, 443 A.2d at 5. There are no disputed material facts that prevent this court from finding that plaintiff has established all the elements to prove liability on this issue.

The course of dealing between the parties established that the misrepresentations were material and served as an inducement for Roadmaster to sign the Agreement. The first draft of the Agreement did not contain the warranties set forth in § 4 or Schedule M. Only after further negotiations and at Roadmaster's request was the section on environmental warranties added to the Agreement. It is significant that the first paragraph of § 4 stated that the warranties and representations were added to "induce RMI (Roadmaster) to consummate the transactions contemplated hereby." On this basis, there is no question that the matters misrepresented were at the heart of the warranties and material to the Agreement. Undisputed cost estimates for remediation running as high as $900,000 made to Bank of New England by MTD further support the materiality of the misrepresentations.

Nor is there any genuine dispute that Roadmaster justifiably relied on these misrepresentations. After all, Columbia and MTD had owned the facility for approximately fourteen years, had hired an environmental consultant to sample the soil and groundwater and were almost continually engaged in negotiations and dealings with state and federal environmental agencies regarding the disposal of hazardous waste at the facility. Roadmaster was unquestionably justified in relying on representations in this regard made by Columbia.

Columbia argues that there are factual issues as to whether Roadmaster justifiably relied on the misrepresentations set forth herein. Defendant contends that the entire subject matter of the lagoons was addressed in the DEP file HW–84–11, specifically referenced in Schedule M. According to Colum-

bia, this subject matter was excluded from the representations and warranties in §§ 4(w)(1) and (3). Columbia also contends that the contract contains a clause which requires that plaintiff establish that defendant intentionally misrepresented material facts with respect to the environmental warranties.

■■ Roadmaster's purported ability to learn the true state of affairs by reading the DEQE file does not release defendant from its responsibility to make sure the property was in the condition warranted and represented by the terms of the Agreement. In fact, plaintiff only learned that the conditions on the land were not as defendant represented in the Agreement by reading reports prepared by Tighe and Bond for the DEQE. The fact that Roadmaster discovered that Columbia misrepresented the conditions at the facility after it signed the Agreement is not relevant since the contract remained executory until the closing.

■■ The defendants also maintain that they are only liable for representations they knew were false when the Agreement was signed. Columbia bases this assertion on the opening proviso to § 4 of the Agreement, which states that the defendants represent and agree to the environmental warranties set forth in the Agreement "to the best of their knowledge and belief." *See* Ex. 1, Vol. I, Plaintiff's App. It is argued that this proviso must be superimposed upon all representations and warranties made by Columbia and requires a factual determination as to the scope of the defendants' actual knowledge of the hazardous waste contamination. Columbia contends that this raises a disputed question of fact that precludes judgment as a matter of law.

Delaware law provides no support for defendants' position. Under the law of that state, there is no need to prove intentionality or knowledge to prevail on the breach of contract claim. Indeed, what is notable about this facet of Delaware contract law—and dispositive with respect to Roadmaster's

a misrepresentation is merely an 'assertion not in accordance with the fact,' Restatement 2d of Contracts, § 159, and such an assertion may be made by conduct as well as words." *Norton v. Poplos*, 443 A.2d at 4.

contract claim—is the absence of the element of intentionality. "It is not necessary, in order that a contract may be rescinded for fraud or misrepresentation, that the party making the misrepresentation should have known that it was false." *Norton v. Poplos*, 443 A.2d at 4, quoting Williston on Contracts, § 1500, at 400–401 (3rd ed. 1970). Consequently, the scope of defendants' actual knowledge is not a relevant inquiry under this aspect of Delaware contract law.

### B. *The Torts of Fraudulent Misrepresentation and Fraudulent Concealment*

There is no quarrel that Massachusetts law applies to plaintiff's tort claims for fraudulent misrepresentation and fraudulent concealment. While both are torts of deceit, certain elemental differences, not squarely addressed by either party, distinguish misrepresentation from concealment. Each tort claim will be examined separately, beginning with fraudulent misrepresentation.

### 1. *Misrepresentation*

A plaintiff "may establish liability by proving [either] an intentional, negligent or innocent misrepresentation under[lies] the formation of a contract." *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1199 (D.Mass.1990). A plaintiff must prove that the "defendant [1] made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing the plaintiff to act thereon, [4] and the plaintiff relied upon the representation as true and [5] acted upon it to his damage." *Id.*, citing *Danca v. Taunton Savings Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982), as quoted in *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir.1987).

■ The elements of fraudulent misrepresentation, with one important distinction, mirror the elements of contract rescission based on misrepresentation. *See supra* at 1165. Fraudulent misrepresentation also requires that the defendant have knowledge that the representation was false. The tort also requires, of course, that plaintiff has acted upon the misrepresentation to its detriment or damage.

Consequently, what was stated in the discussion of the contract claim with respect to materiality, inducement and detrimental reliance applies to this claim and need not be reiterated. The remainder of the discussion of misrepresentation will focus only on the issue of Columbia's knowledge of the falsity of their representations pertaining to the environmental warranties in § 4.

■ Defendants argue that there are no facts in the record that require a reasonable factfinder to conclude that Columbia had "knowledge of any environmental condition existing at the site *on the date the Agreement was signed* which would necessitate any remediation or treatment." Defendant's brief at 23 (emphasis in original). Unfortunately for defendants, this argument is premised on the legal misapprehension that in order to prove the tort of misrepresentation a plaintiff must prove that defendant actually knew its statement was false. To the contrary,

> [i]n this Commonwealth it has been held in a long line of cases that "the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is *not necessary to make any further proof of an actual intent to deceive.*" (emphasis added).

*Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. at 1199, quoting *Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir.1987), quoting *Powell v. Rasmussen*, 355 Mass. 117, 118, 243 N.E.2d 167 (1969), quoting *Chatham Furnace Co. v. Moffatt*, 147 Mass. 403, 404, 18 N.E. 168 (1888). In sum, all that must be established to prove defendants' "knowledge of the falsity of the misrepresentation" is that the representation was false and was susceptible of actual knowledge. No greater showing of intentionality is required.

■ The following material misrepresentations were indisputably made by the defendants and were susceptible of their "actual

knowledge"[4]. At the time the Agreement was signed, Columbia and MTD officials knew, as shown by the Tighe and Bond data, that as of 1986, the contaminant levels of hazardous waste in the soil and groundwater at the facility were well in excess of permissible federal standards. There are no facts of record to suggest that this was no longer the situation in 1990. Contrary to all the available data, defendants represented that acknowledged releases of hazardous substances into the soil had been sufficiently remedied to ensure that current levels of these substances in the soil and groundwater were below those permitted by federal and state laws and regulations or below concentrations that would present a danger to the public health, the environment or to the value of the property or adjacent.

Despite these representations, on March 27–29, 1990, when EPA took samples from the aesthetic pond and fire pond, two areas of the facility not referenced in Schedule M, the agency found concentrations of regulated hazardous materials far in excess of permissible MCL's. Ex. 2 at 6–8, Vol. I, Plaintiff's App. The warranties essentially represented that these contaminants no longer tainted the facility's soil or groundwater at illegal levels. The defendants are not absolved of liability simply because they did not have the results of EPA samples three weeks earlier on March 6, 1990, when the stock purchase Agreement was signed. At that time, defendants expressly assumed the responsibilities in the warranties crafted to assure Roadmaster that no remediation was currently required at the facility.

Defendants also misrepresented facts presumed by the warranties in § 4(w)(3). This section of the Agreement states in relevant part that, except as set forth in Schedule M, Columbia

... is conducting and carrying on its businesses and affairs in full compliance with all Environmental Laws ... [and that] there has never been any significant generation, release, discharge, storage, disposal, transportation, or containment of any Hazardous Substance on or from any portion of any land or buildings owned, leased or operated by the Company, or on or from any portion of any other property contiguous thereto, in violation of any Environmental Laws; and the Stockholders are not aware of, and neither they nor the Company have received notice of, any significant past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans deriving from the operation of the businesses of the Company ... which may interfere with or prevent compliance or continued compliance with applicable Environmental Laws
...

In fact, a number of things occurred prior to the signing of the March 6, 1990 Agreement which make representations in this paragraph of the warranty actionable as a matter of law. Contrary to defendants' representations, they had received notice of circumstances deriving from the operation of the facility which "may interfere with or prevent compliance or continued compliance" with EPA regulations. Most importantly, defendants were repeatedly apprised of the ongoing investigation of the facility by EPA.

On September 2, 1988, defendant Ken Howard, the vice-president of Columbia, received a letter from EPA confirming that the agency would carry out a visual inspection of the facility on September 13, 1988. App. Vol. I, Ex. 8. The letter included an inspection agenda, a preliminary list of thirty-six SWMU's and other areas of concern that had come to the agency's attention. Pursuant to this notice, EPA continued its inspection on January 30–31, 1990. Ex. 32, Vol. II, Plaintiff's App. At that time, EPA and DEQE officials met with Columbia officers and stockholders.

Similarly, Howard's own deposition testimony indicates that prior to March 6, 1990, he knew EPA and DEQE were not satisfied with Columbia's closure plan for the lagoons.

---

**4.** With respect to actual knowledge, *Chatham Furnace Co. v. Moffatt,* 147 Mass. 403, 18 N.E. 168 (1888), the progenitor of this line of misrepresentation claims, states that "fraud consists in stating that the party knows the thing to exist, when he does not know it to exist; and if he does not know it to exist, he must ordinarily be deemed to know that he does not." *Id.* at 404, 18 N.E. 168.

He was therefore on notice that Columbia might not be in compliance with all applicable environmental laws and regulations.

These circumstances indubitably put defendants on notice of their lack of compliance with environmental laws. Under the terms of the warranty defendants had an obligation to make sure there were no facts they could reasonably have discovered that would presently show contamination at levels requiring remediation. These determinations were reasonably within the defendants' ascertainable knowledge, had they conducted further sampling of the soil and groundwater. *Zimmerman v. Kent,* 31 Mass.App. 72, 80, 575 N.E.2d 70 (1991) citing *Cellucci v. Sun Oil Co.,* 2 Mass.App. 722, 730, 320 N.E.2d 919 (1974), ("prediction concerning matter within declarant's control allows liability for misrepresentation").

Defendants argue that the critical inquiry is whether the EPA or DEQE had actually ordered a cleanup or remediation at the time the Agreement was signed. This is not the test. Rather, what is decisive is that the soil and groundwater at the facility were in fact contaminated with hazardous toxins at levels in excess of acceptable legal standards. Defendants certainly knew that the data collected by Tighe and Bond in 1986 revealed that hazardous substances previously released in the soil and groundwater at the facility had not been sufficiently remedied to avoid further treatment or removal as evidenced by their presence in excess of levels permitted by federal regulations. Whether this was still the case in March, 1990 and whether there was other contamination on the property was certainly susceptible of defendants' knowledge. "[O]ne cannot avoid rescission of an agreement entered into in reliance upon a material representation carelessly made, designed to avoid the discovery of available facts which might belie the representation." *Waste Management of Massachusetts, Inc. v. Carver,* 37 Mass.App. 694, 698, 642 N.E.2d 1058 (1994).

Defendants' overarching response to these undisputed facts is that the determination by governmental agencies that Columbia was in fact in violation of environmental laws did not occur until *after* the Agreement was signed

and that they cannot be held liable for representations about future events. First of all, as explained above, the facts misrepresented were discoverable by defendants prior to March 6, 1990 and do not relate to future events. Neither common sense nor the language of the Agreement require that a cleanup order from a government environmental agency be issued or an adjudicatory decision be reached to establish that defendants breached the environmental warranties in the Agreement. It is enough that defendant actually knew or could have determined that the soil and groundwater contamination was in excess of that permitted by federal regulations and that levels in excess of these standards by definition posed a threat to human health, welfare and environment.

However, even if the determination that the soil was contaminated was considered a future event, the *Zimmerman* court explains that statements or representations about future events do not preclude recovery "where the parties to the transaction are not on equal footing but where one was or is in a position where he should have superior knowledge concerning the matter to which the misrepresentations relate." *Id.* at 80, 575 N.E.2d 70, quoting *Gopen v. American Supply Co.,* 10 Mass.App. 342, 345, 407 N.E.2d 1255 (1980). Relative to Roadmaster, the defendants, as sellers in possession of the facility, were in a far better position to make a determination of the levels of contamination on the facility premises at the time the bargain was being struck.

■ Defendants further argue that Roadmaster had a duty to investigate independently and not rely on representations in the Agreement. Specifically, defendant contends that the DEQE administrative proceeding file, HW 84–11, referenced in Schedule M, was a public record and could have been reviewed by plaintiff. The law creates no such duty. On the contrary, the law states that a "recipient of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Yorke v. Taylor,* 332 Mass. 368, 374, 124 N.E.2d 912 (1955); *Henderson v. D'Annolfo,* 15 Mass.App. 413,

423, 446 N.E.2d 103 (1983). Only reliance on "preposterous or palpably false" representations vitiates a misrepresentation claim. *Zimmerman v. Kent*, 31 Mass.App. at 81, 575 N.E.2d 70 (further citations omitted).

■ Defendant's assertion that the facts misrepresented were "obviously false" is likewise unsupported and belied by the record evidence, including the indisputable difficulty plaintiffs had in acquiring the factual data from Columbia and Tighe and Bond.

The misrepresentations concerned bargained-for warranties containing factual matters material to the agreement. Moreover, they were expressly incorporated to induce Roadmaster to purchase the facility. There are no facts in the record that would even permit an inference that plaintiff's reliance on the warranties in the agreement was unreasonable.

Plaintiff has set forth undisputed facts which require the court to allow the motion for summary judgment as to liability on the claim of misrepresentation. At a future date, a factfinder will hear argument and take evidence on damages to determine the plaintiff's "out-of-pocket" expenses in connection with its efforts to purchase the property. *See Zimmerman v. Kent*, 31 Mass.App. at 82, 575 N.E.2d 70.

### 2. *Fraudulent Concealment*

■ Over and above the elements of fraudulent misrepresentation, in order to establish fraudulent concealment, a plaintiff must prove that the defendant took affirmative steps to conceal defects or to prevent the plaintiff from acquiring knowledge of the defects. *See Henshaw v. Cabeceiras*, 14 Mass.App. 225, 227, 437 N.E.2d 1072, *appeal denied*, 387 Mass. 1103, 440 N.E.2d 1177 (1982). While Roadmaster has alleged that Columbia made false statements and concealed the presence of hazardous substances, it has not set forth undisputed facts which establish more than mere nondisclosure. According to Massachusetts decisional law, failure to disclose any nonapparent defect, without more, is not actionable on this theory. *Swinton v. Whitinsville Savings Bank*, 311 Mass. 677, 678–79, 42 N.E.2d 808 (1942), adopting Restatement (Second) of Torts §§ 550 and 551; *See also* Nolan, J. and Sartorio, L., Tort Law, § 142 at 237–239 (2nd Ed.1989).

■ In addition to establishing intentional concealment of information material to the transaction, it must be established that the defendant owed to the plaintiff a fiduciary duty or other similar relation of trust and confidence that required disclosure. *See Bruno v. Bruno*, 10 Mass.App. 918, 919, 411 N.E.2d 1324 (1980); *Walsh v. Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 288, n. 6, 607 N.E.2d 737 (1993), referencing subsection 2, Restatement (Second) of Torts § 551, subsection 2; *see also* Nolan and Sartorio, Tort Law 2d, § 142 at 238. Whether such a relationship existed between Columbia and Roadmaster is a question of fact that was not addressed by plaintiff or defendant. In any case, the absence of undisputed material facts that might establish such a relationship is enough to defeat plaintiff's motion for summary judgment on its claim of fraudulent concealment.

### V. *CONCLUSION*

For the reasons set forth above, the court will ALLOW plaintiff Roadmaster's motion for partial summary judgment as to its claims for breach of contract (Count V), for fraudulent misrepresentation (Count II) and for a declaratory judgment that rescission was proper (Count VI). Plaintiff's motion for summary judgment on its claim for fraudulent concealment (Count I) will be DENIED.

A separate order will issue.